FILED
United States Court of Appeals
Tenth Circuit

February 4, 2025

Christopher M. Wolpert
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

| | |
|---|---|
| DAVID HOFF,<br><br>    Plaintiff - Appellee,<br><br>v.<br><br>AMENDED AND RESTATED ANADARKO PETROLEUM CORP. CHANGE OF CONTROL SEVERANCE PLAN; ANADARKO PETROLEUM CORPORATION HEALTH AND WELFARE BENEFITS ADMINISTRATIVE COMMITTEE,<br><br>    Defendants - Appellants. | No. 23-1361<br>(D.C. No. 1:21-CV-02589-DDD-MEH)<br>(D. Colo.) |

_____

### ORDER AND JUDGMENT[*]

_____

Before **TYMKOVICH**, **McHUGH**, and **ROSSMAN**, Circuit Judges.

_____

David Hoff sought benefits under Anadarko Petroleum's severance plan following the company's acquisition by Occidental Petroleum (Oxy) in 2019. He resigned, claiming his job duties were substantially reduced after the acquisition. Under the severance plan, an employee could leave Oxy the first year after the acquisition so long as the employee's job duties had been "materially" and

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

"adversely" diminished from what they were prior to the acquisition. Oxy, however, denied him benefits on the ground that his resignation was not supported by the change in his job duties.

Hoff sued in federal court and the district court sided with him, finding that his job duties and responsibilities were materially and adversely diminished after the acquisition. We agree with the district court and **AFFIRM**.

## I.  Background

David Hoff worked for Anadarko Petroleum as a Project Manager in the Plants and Major Projects Division. He assumed this role in October 2016, and consistently received positive performance reviews.

In August 2019, Oxy acquired Anadarko. Hoff stayed on, and his job title did not change. But the acquisition was significant, as it constituted a "Change of Control" that triggered severance benefits for employees who worked for Anadarko before the acquisition and stayed afterward. Hoff was such an employee.

### A. Hoff's Job Duties—Before the Acquisition

Before the acquisition, Hoff was responsible for the Latham Gas Plant Project—the company's largest project at the time. The Latham Project entailed managing a budget of $450 million and leading a team of over 300 people. The job required at least 10 years of engineering experience and prior diverse project management experience.

### B. Hoff's Job Duties—After the Acquisition

The Latham Project was finished in March 2020—eight months after the acquisition. After completing that project, Hoff was subject to Oxy's management for the first time, and his everyday experience on the job changed—even though nothing changed on paper.

After the Latham Project was complete, Hoff was given two assignments: (1) the Wattenberg Engine Overhaul Project and (2) the Ramsey Slug Catcher Project. Compared to the Latham Project, these projects were significantly smaller in scale. Both projects entailed managing a team of fewer than 25 people and required only 1–2 years of management experience. Hoff was also assigned to the Mechanical Integrity team, where he was tasked with answering routine engineering questions for service evaluations. This position required no management responsibilities.

After seeing his job duties diminished, on March 30, 2020, Hoff submitted a Good Reason Inquiry Form—a formal inquiry that employees can file (while still employed) to confirm whether they had experienced a "Good Reason" event and obtain severance benefits upon resignation. Under the severance plan, an employee can obtain such benefits if (1) a change of control occurred, and (2) the employee resigned for "Good Reason"—which meant in this case, that the employee's job duties were "materially and adversely diminished" compared to what they were before the change of control.

A few months later, Oxy responded to Hoff's Good Reason Inquiry form. *See* App. Vol. II at 302-04. Oxy concluded that Hoff had not experienced a Good Reason

3

event because, even though his tasks were reduced after the Latham Project, his "responsibilities as a Project Manager [had remained] the same." *Id.* at 303. Still, if Hoff "believe[d] that [his] circumstances constituted a Good Reason event," Oxy told Hoff that he could file a formal claim for benefits. *Id.*

But a day after receiving Oxy's response, Hoff's responsibilities were reduced even further. On June 4, 2020, one of Hoff's projects, the Wattenberg Engine Overhaul Project, was deferred until 2021. Hoff was not given a new assignment, and he resigned from Oxy that same day. Three weeks later, he filed a timely claim for severance benefits on the ground that he resigned for a good reason event.

### C. Relevant Provisions Under the Plan

The Plan contains three relevant provisions. *First*, the Plan provides severance benefits for eligible employees if (1) a "Change of Control" occurred and (2) the employee resigned for "Good Reason." The Plan defines "Good Reason" as when a "Participant's duties and responsibilities as an Employee are *materially and adversely diminished* in comparison to the duties and responsibilities enjoyed by the Participant immediately prior to the Change of Control."[1] App. Vol. I at 62 (emphasis added).

---

[1] Article II of the Plan states in relevant part:

> (s) Good Reason. Good Reason shall mean the occurrence of any of the following:
>
> > (i) the Participant's duties and responsibilities as an Employee are materially and adversely diminished in comparison to the

*Second*, if the employee is resigning for a good reason event, he must do so within one year of the change of control. App. Vol. I at 58.

*Third*, the Plan supplied the standard of review that applies when reviewing a claim for severance benefits. The Plan states in relevant part:

> (g) Effect of Committee Action. The Plan shall be interpreted by the Committee in accordance with the terms of the Plan and their intended meanings. However, the Committee shall have the discretion to make any findings of fact needed in the administration of the Plan, and *shall have the discretion to interpret or construe ambiguous, unclear or implied (but omitted) terms in any fashion that the Committee deems to be appropriate in its sole judgment.* The validity of *any such finding of fact, interpretation, construction or decision shall not be given de novo review* if challenged in court, by arbitration or in any other forum, and shall be upheld *unless clearly arbitrary or capricious*.

*Id.* at 79 (emphases added).

Put simply, the Plan deferred to Oxy when construing "ambiguous, unclear or implied (but omitted) terms," but otherwise assumed de novo review applied to unambiguous terms.

### D. Oxy Denies Hoff's Request for Severance Benefits

In his request to Oxy for severance benefits, Hoff claimed that he suffered a material and adverse diminishment in his job duties after the change of control. Hoff compared his duties while managing the Latham Project, which was his assignment before the acquisition, and the Wattenberg and Ramsey projects, which were his

---

duties and responsibilities enjoyed by the Participant immediately prior to the Change of Control.

5

assignments afterward. Hoff also cited his assistant role in the Mechanical Integrity team, where he had no management responsibilities at all.

 Still, Oxy denied Hoff's request. *See* App. Vol. I at 148-52. Oxy found that Hoff's duties and responsibilities were not materially and adversely diminished because:

  (1) Hoff had retained the same job title, and his job duties did not change;

  (2) His job duties did not state that he was responsible for projects that were the same size and scale as the Latham Project. The Latham Project was an outlier in terms of size and scale. In addition, the pandemic also slowed Oxy's business and therefore affected the availability of large projects;

  (3) Hoff's assignment to smaller projects was temporary, and temporary reductions in workload did not constitute "Good Reason."

*Id.*

 In finding that temporarily reduced workloads did not constitute "Good Reason," Oxy relied on a separate document titled, "Change of Control Severance Plan Interpretation" (Plan Interpretation), which the company issued *after* the acquisition. *See id.* at 141. That document provided examples that aimed to flesh out certain terms in the Plan. To be sure, the Plan Interpretation document stated "[i]f there [was] a difference between the information in this communication and the [Change of Control] Plan document, the [Change of Control] Plan document will control." *Id.*

6

Less than two months later, Hoff appealed the denial within the company, but Oxy affirmed for the same reasons stated in its initial denial.

Hoff then sued in federal district court for improper denial of benefits.

### E. District Court Found that Hoff was Entitled to Severance Benefits

The district court agreed with Hoff, concluding that Oxy wrongfully withheld severance benefits from him. In arriving at this decision, the district court made two findings.

*First*, the district court concluded that de novo review applied to Oxy's interpretation of the Good Reason clause. Because the Plan only provided for arbitrary and capricious review of Oxy's interpretation of "ambiguous, unclear or implied (but omitted) terms," and neither party argued the Good Reason clause was any of these things, the district court concluded that de novo review applied.

*Second*, the district court found that Hoff resigned for good reason by comparing his job duties before and after the acquisition. The district court contrasted Hoff's responsibilities for the Latham Project, which reflected his job duties before the acquisition, and his responsibilities for the Ramsey Project and the Mechanical Integrity team, which reflected his job duties, post-acquisition. The court noted that the reduction in responsibilities were stark and found that Hoff's assignment to the Mechanical Integrity team was especially significant, since that support position did "not hold any comparable responsibilities or duties to Mr. Hoff's project management role . . . prior to the Change of Control." App. Vol. III at 860. The court also noted that the Plan itself did not require material and adverse

7

reduction in job duties to be "permanent," and therefore even temporary reductions in job duties could be "Good Reason" under the Plan. *Id.* at 865–66.

## II.  Discussion

On appeal, Oxy contends that the district court erred in finding that (1) de novo review applied to the company's interpretation of the Good Reason clause, and (2) Hoff suffered a "material and adverse" diminishment in his job duties. We discuss each in turn.

### A. Standard of Review

The parties disagree on the standard of review that applies to Oxy's interpretation and application of the Good Reason clause.

The Supreme Court has held that "'a denial of benefits' covered by [the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*] 'is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). In other words, unless the parties have agreed to an arbitrary and capricious standard of review for certain issues, de novo review applies by default. *See Hodges v. Life Ins. Co. of N. Am.*, 920 F.3d 669, 677 (10th Cir. 2019) ("It is only when a plan specifically confers discretion to decide the question on which the benefit denial is

8

based that the arbitrary and capricious standard applies.") (internal brackets and citation omitted).

As explained above, Section (g) of the Plan provided Oxy "the discretion to interpret or construe *ambiguous, unclear or implied (but omitted) terms* in any fashion that [it] deem[ed] to be appropriate in its sole judgment," and stated that "[t]he validity of any such finding of fact, interpretation, construction or decision *shall not be given de novo review* if challenged in court, by arbitration or in any other forum, and *shall be upheld unless clearly arbitrary or capricious*." App. Vol. I at 79 (emphases added). So, for unambiguous and clear terms, the Plan—and precedent—dictates that we apply de novo review. *See LaAsmar*, 605 F.3d at 796.

Here, neither party argues, nor did they argue below, that the Good Reason clause was "ambiguous, unclear or implied (but omitted)." And since arbitrary and capricious review was reserved for those terms only, de novo review applies to the interpretation and application of the Good Reason clause by default. *See id.*

Oxy's argument to the contrary is unconvincing. Oxy argues arbitrary and capricious review applies because Section (g) states "any such finding of fact, interpretation, construction or decision shall not be given de novo review . . . and shall be upheld unless clearly arbitrary and capricious." That sentence, Oxy contends, grants it blanket discretion to construe the Plan's terms—including the Good Reason clause. But that sentence should not be read in isolation. Careful reading of the operative phrase shows that the Plan was not supplying carte blanche discretion. Rather, the Plan states "any *such* findings of fact, interpretation, [or]

9

construction . . . shall be given arbitrary and capricious review." And that word "such" makes all the difference. The word, "such," identifies what kind of interpretation is at issue, since "[t]he word 'such' usually refers to something that has already been 'described'" or that is "implied or intelligible from the context or circumstances." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 766 (2023) (citations omitted). Here, that referenced phrase was the interpretation of "ambiguous, unclear or implied (but omitted) terms," which is what was described in the sentence immediately preceding it. Therefore, contrary to Oxy's claim, Section (g) only provided deference to ambiguous terms and allowed de novo review for all others— including the Good Reason clause.[2]

We agree with the district court that de novo review applies.

---

[2] All the cases Oxy cites that provide for arbitrary and capricious review are not on point, since the policies in those cases provided the company with broad discretion to interpret the Plan's terms. Not so here. "[T]he Policy contains no such language," so de novo review applies. *Hodges*, 920 F.3d at 678.

In addition, before oral argument, Oxy filed a letter of supplemental authority under Rule 28(j), notifying this court that the Fifth Circuit in *Gift v. Anadarko Petroleum Corp. Change of Control Severance Plan*, No. 23-50862, 2024 WL 4689051 (5th Cir. Nov. 6, 2024) (per curiam), "applied an abuse-of-discretion standard to the Committee's interpretation of the [same] Plan" at issue here. *See* Aplt. Nov. 7, 2024, Rule 28(j) Ltr. at 1. But as Hoff correctly pointed out, the parties in *Gift* "agreed that an abuse of discretion standard applied to review of the Plan administrator's decision" so the Fifth Circuit "had no choice but to apply an abuse of discretion standard." *See* Aplee. Nov. 14, 2024, Rule 28(j) Ltr. at 1 (citing *Gift*, No. 23-50862, 2024 WL 4689051, at *2). The parties here disagree as to the appropriate standard of review, so we find *Gift* of little persuasive value.

### B. The Plan's Good Reason Clause

Oxy next argues that regardless of the standard of review, Hoff did not resign for "Good Reason" as defined by the Plan. Hoff claims he did because he suffered a "material" and "adverse" diminishment in his job duties after Oxy assumed control. To be sure, Oxy does not dispute that Hoff suffered a reduced workload after the acquisition. Oxy merely contends that Hoff's reduced workload was not "material" and "adverse."

#### 1. "Material" and "Adverse" Diminishment in Job Duties

The differences in Hoff's responsibilities before and after the acquisition were stark, and a side-by-side comparison of his job illustrates the point:

| Hoff's Job Duties, Pre-Acquisition | Hoff's Job Duties, Post-Acquisition |
|---|---|
| Budget of $450 Million | Budget of $600,000 |
| Managed a team of over 300 people | Managed a team of fewer than 25 people |
| Required Minimum Project Managing Experience of 10 years | Required Minimum Project Managing Experience of 1-2 years |
|  | Answer engineering questions/no management responsibility |

As shown above, Hoff's everyday experiences on the job changed in a material and adverse way after Oxy took over. The Plan does not define "material" and "adverse," so "we construe them 'in accordance with their ordinary or natural meaning.'" *Interstate Med. Licensure Compact Comm'n v. Bowling*, 113 F.4th 1266, 1279 (10th Cir. 2024) (citation and internal brackets omitted). "Material" is defined as, among other things, "significant; essential." *Material*, BLACK'S LAW

DICTIONARY (12th ed. 2024). "Adverse" is defined as "[a]gainst; opposed (to)," or "[h]aving an opposing or contrary interest, concern, or position." *Adverse*, BLACK'S LAW DICTIONARY (12th ed. 2024). As the chart above shows, the diminishment in Hoff's job duties was "significant" and "opposed to" his interests as a Project Manager of a large company.

Even Oxy's own examples in the Plan Interpretation document support this view. Consider the example below:

> The reduction in duties must be material when compared to the duties performed prior to the Change of Control.
>
> *Management*
>
> Example: An employee went from managing *ten employees to one employee* after the Change of Control. This is a material diminishment.
>
> Example: An employee went from managing ten employees to eight employees after the Change of Control. This is not a material diminishment.

App. Vol. I at 142 (emphasis added).

The reduction in the number of employees Hoff managed after the acquisition (from a team of over 300 people to a team of fewer than 25 people, which is a 12:1 ratio) is *greater* than the ratio in this example (10:1 ratio). While not dispositive, this reduction is significant. The reduction suggests it is reasonable to conclude that Hoff suffered a material and adverse reduction in his job duties. Moreover, Hoff was assigned an *assistant* role to the Mechanical Integrity Team, where he helped answer routine engineering questions for service evaluations. That role did not entail any managing and had no analogue to Hoff's job duties before the acquisition.

Oxy disputes none of this but maintains that Hoff did not resign for good reason because his job duties remained the same on paper, and nothing in Hoff's job duties guaranteed a project like the Latham Project. The Latham Project was an anomaly in its size, Oxy says, so the fact that Hoff received smaller projects does not mean he suffered a material and adverse diminishment in his job duties. In fact, Project Managers are expected to manage all projects, regardless of size.

Oxy's arguments are fair. Project sizes can vary, and the Latham Project may have been an outlier in terms of the project's scale. But Oxy's argument, if adopted, would allow any employer to circumvent a severance plan by keeping an employee's job duties the same on paper while reducing his job responsibilities significantly in reality. And more to the point, the issue is the *degree* and *extent* of diminishment in Hoff's job duties—and not that he was assigned smaller projects per se. In fact, Oxy's own Plan Interpretation document belies the argument Oxy makes here. The Plan Interpretation document, as shown above, defines materiality by examining the actual number of employees that one managed before and after the change of control. It does not examine the employee's job duties on paper.

The Seventh Circuit rejected a similar argument that Oxy makes here. *See Dabertin v. HCR Manor Care*, Inc., 373 F.3d 822, 829 (7th Cir. 2004). Like Hoff, the employee in *Dabertin* argued her employer reduced her job duties after the merger in a way that entitled her to severance benefits. *Id*. at 826. The employer disagreed because "[the employee] had the same list of duties before and after the merger." *Id*. at 829. On appeal, the Seventh Circuit ruled in the employee's favor,

13

finding that the relevant task was examining the nature and significance of her duties after the merger, and not whether her job duties remained the same on paper, or whether she had kept the same job title. *Id.*

In sum, the district court did not err in finding Hoff experienced a material and adverse diminishment in his job duties.

### 2. Causation and Change of Control

Oxy also argues that Hoff's reduced workload did not satisfy the Good Reason clause because the reduction was caused by an economic downturn resulting from the Covid pandemic—not the change of control. Therefore, Oxy contends that Hoff cannot claim severance benefits since (1) his diminished workload was caused by an event that had nothing to do with the change of control, and (2) those smaller projects were all that Oxy had available because of the economic conditions caused by the pandemic.

Neither of Oxy's arguments carry the day. To be sure, it makes sense that the Plan's purpose was to protect employees from the change of control, and not unrelated events like the pandemic. But the way in which the Plan made this purpose explicit was by requiring eligible employees to resign within one year of the change of control—not by requiring the good reason event to be caused by the change of control directly. *See* App. Vol. I at 58. In other words, this one-year time period ensured that the good reason event was tethered to the change of control. After all, the further out a good reason event takes place, the less likely it is related to the change of control.

14

Therefore, as far as the Plan was concerned, Hoff's resignation was tied to the change of control. Hoff resigned within one year of the acquisition, and that was all that was required to be sufficiently related to the change of control under the Plan. Indeed, if the Plan's purpose, as Oxy points out, was to "provide severance compensation for its eligible employees whose employment terminates *following a Change of Control*," App. Vol. I at 57, Hoff's resignation qualifies. Moreover, the Plan also contained a section titled, "Terminations Which Do Not Give Rise to Separation Benefits Under This Plan," and that section did not list terminations for causes unrelated to the change of control. *See id.* at 65. Hoff's resignation was related to the change of control as the Plan defined it.

As to Oxy's claim that the pandemic caused an economic downturn that limited the availability of large projects, that argument is irrelevant under the Plan. The Plan only asks (1) whether a change of control occurred (it did), and (2) whether Hoff suffered a material and adverse reduction in his job duties compared to what he enjoyed "immediately prior to the Change of Control" (he did). *Id.* at 62. The Plan had no force majeure clause for a global pandemic, and it made no exception for a company's choice to slash an employee's job duties in a material and adverse way because of reasons outside the company's control. Even the Plan Interpretation document, which Oxy issued after the acquisition, did not state that a "material" and "adverse" diminishment in job duties must be due to the change of control itself. Oxy's argument, though not without merit, fails to relieve it of its duties under the Plan.

At bottom, the Plan's terms govern, and Hoff complied with them when he resigned. The Plan did not make exceptions to the Good Reason clause if the reduced workload was caused by something other than the change of control. Hoff's reduced workload was therefore good reason under the Plan.

### 3. "Temporary" Reductions in Job Duties

Finally, Oxy argues Hoff's resignation was not for good reason because his assignments to smaller projects were temporary, and temporary assignments do not constitute a "material" and "adverse" reduction in workload under the Plan. Oxy points to the examples in the Plan Interpretation document, which state that temporary reassignments do not constitute a "material" and "adverse" reduction in job duties.

Oxy's reliance on the Plan Interpretation document to make this point is telling, since the Plan itself says nothing about whether a "permanent" reduction in job duties is required. And that makes all the difference, since "[a]n ERISA benefit cannot be a moving target where the plan administrator continues to add conditions precedent to the award of benefits." *Dabertin*, 373 F.3d at 831. This court has "repeatedly rejected efforts to stray from the express terms of a plan, regardless of whom those express terms may benefit." *Allison v. Bank One-Denver*, 289 F.3d 1223, 1236 (10th Cir. 2002). In fact, the Plan Interpretation document underscores this very point, since that document explicitly states that it is "subject to the terms of the COC Plan document," and if there are any differences between the Examples and the Plan, the Plan controls. App. Vol. I at 141. That statement forecloses Oxy's

16

reliance on the Plan Interpretation document since the Plan's terms take precedence, and the Plan does not state that temporary workload reductions do not count as "material" and "adverse."

Neither can Oxy shoehorn the "permanence" requirement into the Plan by framing it as defining or elaborating on the meaning of "material" or "adverse." Oxy never argued that the terms "material" and "adverse" were vague such that they needed further clarification, or that the temporary requirement was implied but omitted. And regardless, a reduction in an employee's job duties can be material and adverse—even if they are temporary. The Plan Interpretation document, which Oxy relies on to make this point, supports this view. After stating that "[t]he change to duties must be permanent," the Plan Interpretation document adds: "[T]he change must *also* be material in order to be considered a Good Reason event." App. Vol. I at 141 (emphasis added). In other words, the Plan Interpretation document confirms that, even if the reductions in Hoff's job responsibilities were temporary, they can still be material and adverse based on the degree and extent of that reduction.

If anything, the example here, which requires a reduction in job duties to be permanent to constitute good reason, can be construed as *adding* to the Plan, and Oxy may not do that through the Plan Interpretation document. The Plan states "[if] a Change of Control occurs, the Plan shall no longer be subject to amendment, change, substitution, deletion, revocation or termination in any respect which adversely affects the rights of Participants." *Id.* at 71. And here, the Plan Interpretation document was issued *after* the change of control, and it "adversely affect[s]" Hoff's

17

rights as a Participant by imposing another hurdle to obtain severance benefits—a hurdle that did not exist when he originally agreed to the Plan. So, the Plan controls, and Hoff's reduced workload was therefore enough to obtain benefits under the Plan's terms.[3]

The Plan Interpretation document, though meant to be helpful, must be tied to the Plan's terms; it cannot add to it. But here, it does just that by stating only permanent reductions in job duties count as "material" and "adverse." The Plan requires no such thing, and Oxy may not add such a requirement after the fact.

## III.  Conclusion

For the reasons stated above, we affirm.

Entered for the Court

Timothy M. Tymkovich
Circuit Judge

---

[3] Moreover, Oxy's argument that a temporary reduction in workload cannot constitute good reason under the Plan cannot be squared with the time frame that eligible employees had to resign. The Plan required Participants to resign within 90 days of a good reason event. App. Vol. I at 64. But Oxy never guaranteed Hoff that the temporary reduction in his workload would last no longer than 90 days, so he could still claim severance benefits if Oxy was wrong. Oxy could also not assure Hoff that his new job assignments were truly temporary. Therefore, Oxy cannot hold Hoff's resignation against him—even if the workload reductions were temporary—because Hoff had a short time window to resign, and Hoff had no other assurance that his workload would return to what it was before the acquisition.