**CASE NO. 23-1361**

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

DAVID B. HOFF,

     Plaintiff – Appellee,

v.

AMENDED AND RESTATED ANADARKO PETROLEUM CORP. CHANGE
OF CONTROL SEVERANCE PLAN, and
ANADARKO PETROLEUM CORPORATION HEALTH AND WELFARE
BENEFITS ADMINISTRATIVE COMMITTEE,

     Defendants – Appellants.

On Appeal from the United States District Court
For the District of Colorado
The Honorable Judge Daniel D. Domenico
D. Colo. No. 1:21-CV-02589-DDD-MEH

**APPELLEE'S ANSWER BRIEF**

Respectfully submitted,

Leah P. VanLandschoot
THE LITIGATION BOUTIQUE LLC
78 West 11th Avenue
Denver, Colorado 80204
(303) 355-1942
lvanlandschoot@thelitbot.com

**ORAL ARGUMENT IS REQUESTED**

## **TABLE OF CONTENTS**

TABLE OF CASES, STATUTES AND OTHER AUTHORITIES CITED ........... V

PRIOR OR RELATED APPEALS ............................................................................ 1

STATEMENT OF ISSUES PRESENTED ............................................................. 1

STATEMENT OF THE CASE .................................................................................. 1

    I.   THE RELEVANT PLAN LANGUAGE ............................................................... 3

    II.  PLAINTIFF'S DUTIES AND RESPONSIBILITIES IMMEDIATELY PRIOR TO THE CHANGE IN CONTROL ............................................................... 6

    III. PLAN INTERPRETATION AND EXAMPLES DOCUMENT ................................. 7

    IV. PLAINTIFF'S MATERIALLY AND ADVERSELY DIMINISHED DUTIES AND RESPONSIBILITIES AFTER THE CHANGE IN CONTROL ................................. 8

    V.  PLAINTIFF EXHAUSTED THE PLAIN'S ADMINISTRATIVE CLAIMS PROCEDURES FOR SEPARATION BENEFITS ................................................. 11

    VI. DISTRICT COURT ACTION ........................................................................ 11

SUMMARY OF THE ARGUMENT ...................................................................... 12

ARGUMENT .............................................................................................................. 16

    I.   STANDARD OF REVIEW ........................................................................... 16

    II.  THIS COURT SHOULD REVIEW THE COMMITTEE'S DENIAL OF BENEFITS TO PLAINTIFF UNDER A *DE NOVO* STANDARD ................................. 16

    III. PLAINTIFF RESIGNED FOR GOOD REASON AND IS ENTITLED TO SEPARATION BENEFITS ........................................................................ 19

        A.  *Plaintiff's Duties and Responsibilities Were Materially and Adversely Diminished* ................................................................. 20

    B.    *Plaintiff's Demotion to a Part-Time Project Manager Role Show His Duties Were Diminished* ......................................................21

    C.    *The Plan Does Not Exclude Temporary Diminishments*.............24

IV. DENIAL OF PLAINTIFF'S CLAIM FOR SEPARATION BENEFITS WAS ARBITRARY AND CAPRICIOUS ...............................................................30

    A.    *The Plan Administrator is Entitled to Less Deference Due to its Inherent Conflict of Interest* .........................................................31

    B.    *The Committee Abused Its Discretion When It Failed to Apply the Plan as Written* ...........................................................................34

    C.    *The Plan Administrator's Reliance on the Absence of Promises or Guarantees to Plaintiff to Deny His Claim Was an Abuse of Discretion* .................................................................................35

    D.    *Reliance on Plaintiff's Job Title is Arbitrary and Capricious* ....36

    E.    *The Plan Administrator's Focus on Causation is Contrary to the Plan's Plain Language* ............................................................38

    F.    *The Committee's Post Hoc Contention that Plaintiff's Diminishment of Duties and Responsibilities Was Temporary was an Abuse of Discretion* ...............................................................40

    G.    *The Committee's Efforts to Get Mr. Allin to Contradict and Disavow His Sworn Statements is an Abuse of Discretion* .........44

    H.    *The Committee's Discussion of Plaintiff's Preference Not to Travel Confirms Defendants were Intentionally Avoiding a Good Reason Event* ................................................................................46

V. THE CASES CITED BY DEFENDANTS ARE INAPPOSITE ...............................47

CONCLUSION ........................................................................................52

STATEMENT REGARDING ORAL ARGUMENT .............................................53

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ..........56

CERTIFICATE OF DIGITAL SUBMISSION........................................................57

# TABLE OF CASES, STATUTES AND OTHER AUTHORITIES CITED

### CASES

Adair v. Abbott Severance Pay Plan for Emp. of Kos Pharm.,
   781 F. Supp. 2d 238  (D.N.J. 2011).......................................................50

Allison v. Bank One-Denver, 289 F.3d 1223 (10th Cir. 2002) .................. 23, 27, 35

Benson v. Hartford Life & Acc. Ins. Co., 511 Fed. Appx. 680 (10th Cir. 2013)....16

Bowles v. Quantum Chem. Co., 266 F.3d 622 (7th Cir. 2001) ......................... 21, 23

Boyd v. ConAgra Foods, Inc., 879 F.3d 314 (8th Cir. 2018).................................48

Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276 (10th Cir. 2002) ....... 22, 30, 38

Clark v. Fifth Amended and Restated Newfield Exploration Co.,
   2021 WL 5155699 (S.D. Tex. 2021).....................................................49

Clayton v. ConocoPhillips Co., 2010 WL 11578477 (S.D. Tex. 2010) .................50

Dabertin v. HCR Manor Care, Inc., 373 F.3d 822 (7th Cir. 2004)................... 21, 23

Egert v. Connecticut Gen. Life Ins. Co., 900 F.2d 1032 (7th Cir. 1990) ...............29

Evans v. Newfield Expl. Co., 2021 WL 2764858 (S.D. Tex. 2021) ............... 48, 49

Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989)..................... 16, 18, 32

Gall v. Liberty Mut. Ins. Grp., 2001 WL 290194 (N.D. Ill. 2001).........................51

Gosselink v. Am. Tel. & Tel., Inc., 272 F.3d 722 (5th Cir. 2001) ..........................24

Graham v. Hartford Life & Acc. Ins. Co., 589 F.3d 1345 (10th Cir. 2009)..... 17, 32

Hupp v. Metromail Corp. Special Severance Plan,
   133 F. Supp. 2d 681 (N.D. Ill. 2001)....................................................51

Jones v. Kodak Med. Assistance Plan, 169 F.3d 1287 (10th Cir. 1999)................32

<u>Kreuger v. Surewest Comm., Inc.</u>, 2014 WL 4635581 (E.D. Cal. 2014)...............49

<u>Lickteig v. Business Men's Assurance Co.</u>, 61 F.3d 579 (8th Cir. 1995)..............23

<u>Liston v. Unum Corp. Officer Severance Plan</u>, 330 F.3d 19 (1st Cir. 2003) ..........48

<u>Martinez v. Plumbers & Pipefitters Nat. Pension Plan</u>,
    795 F.3d 1211 (10th Cir. 2015) ..............................................................19

<u>Mason v. Reliance Standard Life Ins. Co.</u>, No. 14-CV-01415- MSK-NYW,
    2015 WL 5719648 (D. Colo. Sept. 30, 2015) ......................................30

<u>McClure v. Vice President, Human Res., Union Carbide Corp.</u>, CIV.A. H030054,
    2005 WL 1214645 (S.D. Tex. May 20, 2005) ....................................21

<u>McGee v. Equicor- Equitable HCA Corp.</u>, 953 F.2d 1192 (10th Cir. 1992) ..........27

<u>Metro. Life Ins. Co. v. Glenn</u>, 554 U.S. 105 (2008)......................................... 32, 33

<u>Murphy v. Deloitte & Touche Grp. Ins. Plan</u>, 619 F.3d 1151 (10th Cir. 2010)......38

<u>Nance v. Sun Life Assurance Co. of Canada</u>,
    294 F.3d 1263 (10th Cir. 2002) ............................................... 16, 17, 18

<u>Pepe v. Newspaper & Mail Deliveries'-Publishers' Pension Fund</u>,
    559 F.3d 140 (2d Cir. 2009) ..............................................................35

<u>Pirkheim v. First Unum Life Ins.</u>, 229 F.3d 1008 (10th Cir. 2000).......................28

<u>Pitman v. Blue Cross & Blue Shield of Oklahoma</u>,
    217 F.3d 1291 (10th Cir. 2000) .................................................... 32, 34

<u>Scruggs v. ExxonMobil Pension Plan</u>, 585 F.3d 1356 (10th Cir. 2009) ................16

<u>Swaback v. Am. Info. Techs. Corp.</u>, 103 F.3d 535 (7th Cir. 1996) .......... 15, 24, 35

<u>Van Steen v. Life Ins. Co. of N. Am.</u>, 878 F.3d 994 (10th Cir. 2018) ............ 30, 32

<u>Yochum v. Barnett Banks, Inc. Severance Pay Plan</u>,
    234 F.3d 541 (11th Cir. 2000) ..................................................... 33, 34

## Statutes

28 U.S.C. §1961 ...............................................................................57

29 U.S.C. § 1102(a)(1) .....................................................................36

29 U.S.C. § 1104(a) ..........................................................................12

29 U.S.C. § 1132(a)(1)(B) ................................................................12

29 U.S.C. §1002(1) .............................................................................3

29 U.S.C. §1002(8) .............................................................................3

Colo. Rev. Stat. § 5-12-102(2) .........................................................57

Employee Retirement Income Security Act of 1974 ...........................1

## PRIOR OR RELATED APPEALS

None.

## STATEMENT OF ISSUES PRESENTED

1.      Should this Court affirm the District Court's Final Judgment in favor of Plaintiff-Appellee David B. Hoff?

2.      Like the District Court, should this Court apply the *de novo* standard of review to the Plan Administrator's denial of Plaintiff-Appellee's separation benefits under the unambiguous terms of the Plan where the Plan's language grants limited discretion only as to interpreting and construing the Plan's ambiguous terms?

3.      Did Plaintiff-Appellee resign for Good Reason under the Plan and was therefore entitled to separation benefits?

4.      Was the Plan Administrator's use of irrelevant factors and its consideration of criteria outside the unambiguous plain language of the Plan to deny Plaintiff-Appellee's separation benefits arbitrary and capricious?

## STATEMENT OF THE CASE

Plaintiff-Appellee, David B. Hoff ("Plaintiff" or "Mr. Hoff"), asserted claims in the United States District Court for the District of Colorado (the "District Court") under the Employee Retirement Income Security Act of 1974 ("ERISA") for: (1) improper denial of benefits; and (2) breach of fiduciary duty, against Defendants-Appellants, the Amended and Restated Anadarko Petroleum

Corporation Change of Control Severance Plan (together with additional amendments,[1] the "Plan") and the Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee, as Plan Administrator ("Plan Administrator" or "Committee") (Plan and Committee together, "Defendants"). App. Vol. I at 9-29.

Plaintiff is entitled to separation benefits under the Plan because, on March 9, 2020, his job duties and responsibilities for Occidental Petroleum Corporation ("Oxy") were materially and adversely diminished in comparison to the duties and responsibilities he held as Project Manager in the Plants and Major Projects Division for Anadarko Petroleum Corporation d/b/a Western Midstream Partners, LP ("WES") (together "Anadarko"), just prior to its acquisition by Oxy on August 8, 2019 (the "Change in Control" or "COC").

On October 19, 2023, the District Court reversed Defendants' denial of Plaintiff's claim for benefits under the Plan, awarded Plaintiff his separation benefits under the Plan, pre-judgment interest, post-judgment interest, reasonable costs, and entered judgment in favor of Plaintiff and against Defendants ("District

---

[1] The Amended and Restated Anadarko Petroleum Corporation Change of Control Severance Plan was amended with a First Amendment adopted on April 15, 2008, a Second Amendment adopted on October 26, 2009, and a Third Amendment adopted on December 20, 2010.  See Appellants' Appendix Volume I (hereafter "App. Vol. I") at 57-86.

Court Order"). App. Vol. III at 849-869, 870-871. The District Court Order was based on a fair, thorough, and well-reasoned analysis of the facts, the relevant Plan language, and applicable legal authorities, and therefore, should be affirmed by this Court.

Even if this Court applies the arbitrary and capricious standard, the Court should find the Committee abused its discretion in denying Plaintiff's claims for separation benefits where it failed to apply the Plan as written, and should affirm the District Court Order and Final Judgment in favor of Plaintiff.

## I.    <u>The Relevant Plan Language</u>

The Amended and Restated Anadarko Petroleum Corporation Change of Control Severance Plan is an employee benefit plan within the meaning of Section 3(1) of ERISA, 29 U.S.C. §1002(1), effective September 1, 2007. App. Vol. I at 57-86. The Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee is the Plan's named fiduciary and Plan Administrator. App. Vol. I at 63, 73, 82.

As an employee of Anadarko prior to the Change in Control, Plaintiff was a "Participant" of the Plan, as defined in Section 3.1 of the Plan. App. Vol. I at 61-62, 64, 70. Plaintiff was thus a beneficiary of the Plan within the meaning of Section 3(7) of ERISA, 29 U.S.C. §1002(8).

On August 8, 2019, Oxy acquired Anadarko pursuant to a merger agreement between Anadarko, Oxy and a subsidiary of Oxy, Western Midstream (WES) which constituted a "Change of Control" under the Plan.  App. Vol. I at 59-60.

Under Article IV, <u>SEPARATION BENEFITS</u>, the Plan provides in relevant part:

> 4.1 <u>Right to Separation Benefits</u>. A Participant shall be entitled to receive Separation Benefits as provided in <u>Section 4.3</u> if a Change of Control occurs and his or her Employment terminates under a circumstance specified in <u>Section 4.2(a)</u>. An additional Change of Control shall not trigger any additional Separation Benefits for the Participant.
>
> 4.2 <u>Termination of Employment</u>.
>
> (a) <u>Terminations Which Give Rise to Separation Benefits Under This Plan</u>.
> . . .
> (ii) A termination for Good Reason during the Applicable Period; <u>provided</u>, <u>that</u>, the Participant terminates his or her Employment within ninety (90) days of such occurrence; . . .

App. Vol. I at 64-65.

Pursuant to Article II(s) of the Plan, "Good Reason" is defined in relevant part as:

> (s) <u>Good Reason</u>. Good Reason shall mean the occurrence of any of the following:
>
> (i) the Participant's duties and responsibilities as an Employee are materially and adversely diminished in comparison to the duties and responsibilities enjoyed by the Participant immediately prior to the Change of Control;
> . . .

(iv) the Participant is required to be based at a location more than 25 miles from the primary location where the Participant was based and performed services immediately prior to the Change of Control;

(v) the Participant is required by the Employer to take an assignment or position that requires him or her to travel on frequent overnight trips resulting in extended stays away from home on a consistent basis and to a substantially greater extent than was required immediately prior to the Change of Control (this provision excludes assignments or positions that might require temporary travel for a specified, short duration of time, regardless of whether such assignment or position is the result of circumstances related to the Change of Control); . . . .

App. Vol. I at 62.

Under the Plan, Participants must resign their employment within 90 days of a Good Reason event if the event occurs in the Applicable Period. App. Vol. I at 58. Here, the Applicable Period was any time between August 9, 2019 (the Change in Control) and August 8, 2020 (the first anniversary of the Change of Control). App. Vol. I at 58. If a Participant resigns during that period, the Participant may receive separation benefits from the Plan. App. Vol. I at 64.

As part of the First Amendment, Article 9 of the Plan conferred certain limited discretion to the Committee in interpreting the plan:

(g) <u>Effect of Committee Action</u>. The Plan shall be interpreted by the Committee in accordance with the terms of the Plan and their intended meanings. However, the Committee shall have the discretion to make any findings of fact needed in the administration of the Plan, and shall have the discretion to interpret or construe **ambiguous, unclear or implied (but omitted) terms** in any fashion that the Committee deems to be appropriate in its sole judgment. The validity of any such finding of fact, interpretation, construction or decision shall not be given *de*

*novo* review if challenged in court, by arbitration or in any other
forum, and shall be upheld unless clearly arbitrary or capricious. . . .

App. Vol. I at 79 (emphasis added).

## II.    Plaintiff's Duties and Responsibilities Immediately Prior to the Change in Control

Plaintiff was a Project Manager for the Plants and Major Projects Division
for Anadarko prior to its acquisition by Oxy on August 8, 2019, the Change in
Control.  App. Vol. I at 125.  Immediately prior to the Change in Control, Plaintiff
was Project Manager for the Latham Gas Plant Project.  App. Vol. I at 126.  The
Latham Gas Plant Project was the largest project in the Major Projects Division,
had a $450 Million combined budget, and required leading and coordinating all
aspects of the project, scheduling, scope, and management of a team of
approximately 300 construction contractors, 20 engineers, and 10-15 construction
inspectors. App. Vol. I at 126.  The role required a minimum of 10 years of
engineer experience and prior diverse project management.  App. Vol. I at 126,
161.

Prior to his promotion to the Plants and Major Projects Division, Plaintiff
was recognized in his 2015 Performance Review for "continu[ing] to grow as a
leader" and "easily taking on increasing levels of responsibility."  App. Vol. I at
117.  Shortly thereafter, Plaintiff was promoted to the Plants and Major Projects
Division.  App. Vol. I at 13.  His supervisor was Jay Allin ("Mr. Allin"), Director

of the Plants and Major Projects Division.  App. Vol. I at 125.  From that time until

March 9, 2020, Plaintiff was assigned to manage projects that steadily increased in

size and scope, even being lauded by Mr. Allin, in his 2017 Performance Review

for being "the best of the best" and "tak[ing] on the highest profile projects and

execut[ing] them exceptionally."  App. Vol. I at 124.  After Mr. Allin's review,

Plaintiff's duties and responsibilities continued to materially increase.  As a result,

he was given responsibility over the Latham Gas Plant Project.  App. Vol. I at 126.

### III.    Plan Interpretation and Examples Document

On September 10, 2019, after the Change in Control, the Committee

released the Anadarko Petroleum Corporation Change of Control Severance Plan

Interpretation by the Plan Administrator and Examples ("Examples").  App. Vol. I

at 141-144.  It was provided "subject to the terms" of the Plan and specified, "[i]f

there is a difference between the information in this communication and the [Plan]

document, the [Plan] document will control."  Id.  The Examples provided several

scenarios relevant here:

> The change to duties must be permanent. A short-term reduction in
> duties due to lack of work, transition, reorganization, or similar
> matters does not qualify.

> Example: During the integration of Oxy and Anadarko, work slows
> down while management reviews work processes. Because this is
> temporary, it does not qualify.

> Example: A supervisor states that one or more job duties held by the
> employee has been taken away. This is a permanent change.

Note: As described in more detail below, the change must also be material in order to be considered a Good Reason event. Not all changes in job duties will be material.

. . .

The reduction in duties must be material when compared to the duties performed prior to the Change of Control.

*Management*

Example: An employee went from managing ten employees to one employee after the Change of Control. This is a material diminishment.

Example: An employee went from managing ten employees to eight employees after the Change of Control. This is not a material diminishment.

App. Vol. I at 141-142.

## IV.    Plaintiff's Materially and Adversely Diminished Duties and Responsibilities after the Change in Control

Plaintiff first experienced a Good Reason event on March 9, 2020.  On that date, the Latham Gas Plant Project was completed, and Plaintiff was assigned to manage two small projects: (1) the Wattenberg Engine Overhaul; and (2) the Ramsey Slug Catcher.  App. Vol. I at 126, 149.  According to Mr. Allin, the minimum experience required to be Project Manager for the Ramsey Slug Catcher project was 1-2 years of engineer experience.  App. Vol. I at 126.  In contrast, to be Project Manager for the Latham Gas Plant Project (Plaintiff's assignment immediately prior to the Change in Control), Plaintiff needed at least 10 years of

engineer experience and prior diverse project management experience (including Plaintiff's experience with managing compressors stations and pipelines and the construction portion of a train at the Ramsey Gas Plant). App. Vol. I at 126, 161. According to Mr. Allin, Plaintiff's experience-level was not required in managing projects like the Wattenberg Engine Overhaul and the Ramsey Slug Catcher and his marketability as a Project Manager was in fact diminished by the smaller size, smaller budget, and smaller scope of these projects. App. Vol. I at 126-127. For these small projects, Plaintiff's management responsibilities were over teams of 10-20 construction contractors, 1-2 engineers, and 1-2 construction inspectors. App. Vol. I at 127.

During the next several weeks, Plaintiff's duties and responsibilities would be materially and adversely diminished further. Specifically, in April 2020, Mr. Allin and Michael Forsyth, VP of Engineering, forced Plaintiff to join the Mechanical Integrity (MI) team to assist with answering engineering questions for service evaluations and making other supporting calculations. App. Vol. I at 128-129. Indeed, the role Plaintiff was formally introduced into by the MI Supervisor on April 30, 2020, was not a project manager role at all. App. Vol. I at 131. At this point, Plaintiff's Project Manager role was effectively gone. He was no longer getting new Project Manager assignments and he did not hold any duties or

9

responsibilities comparable to the duties and responsibilities he held just prior to

the Change in Control.  App. Vol. I at 161-163.

Additionally, before Plaintiff resigned for Good Reason on June 4, 2020, the

Wattenberg Engine Overhaul was deferred until 2021.  App. Vol. I at 107, 126.

Plaintiff was not given any further project management assignments. App. Vol. I at

106.  Plaintiff resigned the same day.  App. Vol. I at 87.

At the time of his resignation for Good Reason, Plaintiff's duties and

responsibilities as Project Manager had materially and adversely diminished.

Plaintiff went from managing a $450 Million project, supervising over 300

workers and contractors, to running a single $600,000 project and answering

engineering questions for service evaluations.  App. Vol. I at 126-129.  Plaintiff

was responsible for budgeted projects equaling less than 0.14% of what he was

responsible for just prior to the Change in Control.  App. Vol. I at 126.

Plaintiff was not assigned any major projects and was not assigned any

increased duties or responsibilities comparable to those he had before the Change

in Control.  Plaintiff resigned for Good Reason under the Plan.  App. Vol. I at 106,

109.

To be eligible for separation benefits under the Plan, Plaintiff's resignation

for Good Reason was required to be within 90 days of the Good Reason event.

App. Vol. I at 64.  Plaintiff resigned on the 87th day following the first Good

Reason event.  App. Vol. I at 14-15.

## V.    Plaintiff Exhausted the Plain's Administrative Claims Procedures for Separation Benefits

Plaintiff exhausted the administration and claims procedures required under

the Plan to obtain his separation benefits.  App. Vol. I at 63-70, 73-75.

On July 27, 2020, Plaintiff filed his claim for benefits, asserting he resigned

in relation to a Good Reason event.  App. Vol. I at 160-163.  Plaintiff included a

declaration from his supervisor, Mr. Allin.  App. Vol. I at 164-166.  Plaintiff's

claim for separation benefits was timely made pursuant to Article IX, Section 9.2

of the Plan.  App. Vol. I at 160-166.  The Committee denied Plaintiff's claim on

January 24, 2021. App. Vol. I at 146, 148-158.

On March 11, 2021, Plaintiff timely appealed the Committee's denial.  App.

Vol. I at 104-129.  The Committee then denied his appeal on July 9, 2021, for the

same reasons it denied his claim.  App. Vol. I at 87-102.  In the appeal denial,

Plaintiff was notified his claim was perfected (App. Vol. I at 88), and he may file a

lawsuit within a year.  App. Vol. I at 98.

## VI.    District Court Action

On September 23, 2021, Plaintiff filed his complaint for improper denial of

benefits under 29 U.S.C. § 1132(a)(1)(B) and breach of fiduciary duty under 29

U.S.C. § 1104(a). App. Vol. I at 9-29.

On October 19, 2023, the District Court reversed Defendants' denial of Plaintiff's claim for benefits, awarded Plaintiff his separation benefits, pre-judgment interest, post-judgment interest, reasonable costs, and entered judgment in favor of Plaintiff and against Defendants.  App. Vol. III at 849-871.

## SUMMARY OF THE ARGUMENT

Plaintiff is entitled to separation benefits under the Plan because, on March 9, 2020, his job duties and responsibilities were materially and adversely diminished in comparison to the duties and responsibilities he held as Project Manager in the Plants and Major Projects Division for Anadarko just prior the Change in Control.

Prior to the Change in Control, on August 7, 2019, Plaintiff had responsibility over a $450 Million combined project budget, which required leading and coordinating all aspects of the project, scheduling, scope, and management of a team of over 300 people.  App. Vol. I at 126.  In contrast, by March 9, 2020, and continuing through June 4, 2020, Plaintiff's responsibilities had deflated to managing one single $600,000 project (Id.), and providing engineering support to the MI team where he answered engineering questions for service evaluations and made other supporting calculations - a role with no management duties or responsibilities.  App. Vol. I at 128-129, 131.

The underlying facts are not disputed.  Plaintiff's title of "Project Manager" did not change.  App. Vol. III at 669.  Between March 9, 2020 and June 4, 2020, Oxy did not have any comparable size projects to the one Plaintiff was managing just prior to the Change in Control.  Id.  Plaintiff was not demoted in title or salary.  Id.  Plaintiff was never promised that the projects he would manage as Project Manager would only ever increase in size.  Id.  Plaintiff was never guaranteed certain size projects or certain levels of responsibility.  Id.  There may have been larger projects that could have been assigned to Plaintiff in the future if he had stayed employed with Oxy.  Id.  Finally, the material and adverse diminishment of Plaintiff's duties and responsibilities was not caused by the Change in Control, nor was it caused by any intentional conduct by Oxy.  Id.  With all of these facts being true, Plaintiff is still entitled to separation benefits under the Plan.

Under the plain language of the Plan, as applied to the undisputed facts, Plaintiff suffered a Good Reason event and timely resigned because his duties and responsibilities were materially and adversely diminished in comparison to the duties and responsibilities enjoyed by Plaintiff immediately prior to the Change of Control.  App. Vol. I at 62.

Defendants' use of criteria outside the plain language of the Plan to deny Plaintiff's benefits was arbitrary and capricious.  App. Vol. I at 87-102, 148-158. Indeed, nothing in the Plan's unambiguous language requires that, to be eligible for

separation benefits, Plaintiff's job title change, that Oxy make an express (or implied) promise that Plaintiff will only manage projects increasing in size throughout his career, that Oxy make an express (or implied) promise that Plaintiff will only work on certain sized projects, that there is opportunity for potential new projects sometime in the future, or that there is any particular reason or cause, whether within or outside of Oxy's control, for the material and adverse diminishment of Plaintiff's duties and responsibilities. App. Vol. I at 57-86. When the Plan Administrator required all of these conditions to be true for Plaintiff to be entitled to benefits (App. Vol. I at 90-93, 149-152), the Plan Administrator abused its discretion and acted in its conflicting financial interest of preserving company resources during a time the Plan Administrator labelled an "economic crisis," which was a clear abuse of discretion. App. Vol. I at 91.

Further, if the Court applies an arbitrary and capricious standard, the Court should view the Plan Administrator's denial of Plaintiff's claim for benefits with an especially critical eye, where, as here, every member of the Committee who was involved in denying Plaintiff's claim is an executive-level, long-term employee of Oxy, the Plan payor, who benefitted from limiting Oxy's payout to Plaintiff of the nearly $700,000 he was entitled to (at the time of the administrative denials) by keeping Oxy's financial resources with Oxy during what the Plan Administrator

characterized as "a time the oil industry was facing dire economic hardships." App. Vol. I at 91.  This presents a clear conflict of interest.

Defendants cannot remedy the fact that the Plan Administrator's denial of Plaintiff's claim for benefits was based on words and phrases it improperly inserted into the Plan for the sole purpose of denying Plaintiff's claim.  Because the Plan Administrator controverted the plain language of the Plan to add requirements for Plaintiff to overcome which are not contained in the Plan's terms, its denial of Plaintiff's claim is arbitrary and capricious.  See Swaback v. Am. Info. Techs. Corp., 103 F.3d 535, 540 and n. 9 (7th Cir. 1996) ("if administrators of an ERISA plan controvert the plain meaning of a plan, their actions are arbitrary and capricious.").

None of the Plan Administrator's justifications for denial of Plaintiff's claim changes the dispositive fact: Plaintiff's duties and responsibilities immediately prior to the Change in Control of managing a $450 Million project and leading a team of over 300 people were materially and adversely diminished on the date he resigned, when Plaintiff was managing one $600,000 project and answering engineering questions for service evaluations.  App. Vol. I at 128-129, 131.  Every other consideration by the Plan Administrator used to deny Plaintiff's claim is contrary to the plain language of the Plan.  App. Vol. I at 57-86.

# ARGUMENT

## I.    Standard of Review

"[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Nance v. Sun Life Assurance Co. of Canada, 294 F.3d 1263, 1266 (10th Cir. 2002).

Where the plan administrator's decision relies on an interpretation of the language in the plan, the Court must first consider whether the provision is ambiguous. If the plan documents, examined as a whole, are unambiguous, the Court must construe them as a matter of law. Benson v. Hartford Life & Acc. Ins. Co., 511 Fed. Appx. 680, 687 (10th Cir. 2013) (citing Scruggs v. ExxonMobil Pension Plan, 585 F.3d 1356, 1362 (10th Cir. 2009)).

## II.    This Court Should Review the Committee's Denial of Benefits to Plaintiff Under a *de novo* Standard

Here, the applicable language in the Plan is unambiguous. Moreover, Defendants have never argued that the Plan language relevant to Plaintiff's claim is ambiguous. App. Vol. III at 720-750, 805-816. Because Defendants concede the relevant Plan language is unambiguous, the Committee's limited discretion to

interpret or construe ambiguous terms of the Plan (App. Vol. I at 79) does not apply to its decision to deny Plaintiff's benefits.

Based on this reasoning, the District Court properly reviewed the Plan Administrator's decision *de novo*, and reversed Defendants' denial of Plaintiff's claim for benefits after applying the Plan's plain language to the undisputed facts. This Court should reach the same conclusion. The District Court provided a reasoned explanation as to why the Plan Administrator's decision must be reviewed *de novo:*

> In determining the appropriate standard, "it is essential to focus precisely on what decision is at issue, because a plan may grant the administrator discretion to make some decisions but not others." *Nance v. Sun Life Assur. Co. of Canada*, 294 F.3d 1263, 1266 (10th Cir. 2002). Here, the Plan unambiguously provides discretion to the Committee in specific instances, but also limits that discretion. The Plan requires that it be "interpreted by the Committee in accordance with the terms of the Plan and their intended meanings." (R. 23 [/App. Vol. I at 79].) The Plan, however, provides "discretion to make any findings of fact needed in the administration of the Plan, and . . . to interpret or construe ambiguous, unclear or implied (but omitted) terms in any fashion that the Committee deems to be appropriate in its sole judgment." (R. 23 [/App. Vol. I at 79].) As further clarification, the Plan provides that the "validity of any such finding of fact, interpretation, construction or decision shall not be given de novo review if challenged in court, by arbitration or in any other forum, and shall be upheld unless clearly arbitrary or capricious." (R. 23 [/App. Vol. I at 79].) Thus, in accordance with this language, the Court must apply an arbitrary and capricious standard to the Committee's findings of fact and interpretations of language that is ambiguous, unclear, or implied but omitted. *Graham* [*v. Hartford Life & Acc. Ins. Co.*], 589 F.3d [1345][,]1358 [(10th Cir. 2009)]. Applying this language here, the Court must give deference to the Committee's findings regarding what Mr. Hoff's position was before and after the Change of Control.

*See Nance*, 294 F.3d at 1267-68 (affirming that the administrator was given discretion over factual findings). Those facts, fortunately, are undisputed.

Mr. Hoff states: Plaintiff admits that his title of "Project Manager" did not change between August 7, 2019 (the day prior to the Change in Control) and June 4, 2020 (the date of his termination for Good Reason). Plaintiff admits that between March 9, 2020 and June 4, 2020, Oxy did not have any comparable size projects to the one he was managing on August 7, 2019. Plaintiff admits that he was not demoted in title or salary by Oxy. Plaintiff admits that he was never promised that the projects he would manage as Project Manager would only ever increase in size. Plaintiff also admits that he was never guaranteed certain size projects or certain levels of responsibility.  Plaintiff admits that there may have been larger projects that could have been assigned to him in the future if he had stayed employed with Oxy.  Finally, Plaintiff admits that the material and adverse diminishment of his duties and responsibilities was not caused by the Change in Control, nor was it caused by any intentional conduct by Oxy. (Doc. 30 at 3 [/App. Vol. III at 669].)

Regarding the Committee's interpretations of the Plan and application of the plan language, the Court will apply the *de novo* standard.  As noted, Defendants do not assert that any of the relevant language is ambiguous or unclear and do not assert that any of the interpretations are meant to cover implied but omitted terms. (Doc. 31 at 18-19 [/App. Vol. III at 741-742].)  The Plan's grant of discretion to the Committee on such matters is therefore not applicable here.

ERISA and the related caselaw do not prescribe a separate standard of review to the application of plan language to facts.  *Firestone Tire & Rubber Co.*, 489 U.S. at 115. The Supreme Court instead has adopted the *de novo* standard for all issues where a plan does not give the plan administrator discretion. *Id.*; *see also Nance*, 294 F.3d at 1266. Further, the Plan makes explicit the Plan should be interpreted by the Committee using its term's intend meanings, thereby limiting the Committee's discretion in plan interpretation outside of the enumerated exceptions. (R. 23 [/App. Vol. I at 79].)  Thus, this case differs from cases where the administrator is explicitly provided with general interpretive authority by explicitly providing discretion, for

example, to "construe the terms of the Plan, . . . and to determine any questions which may arise with the Plan's application or administration, including but not limited to determination of eligibility for benefits" as in *Martinez [v. Plumbers & Pipefitters Nat. Pension Plan]*, 795 F.3d [1211][,]1214 [(10th Cir. 2015)].  Here, the grant of discretion is explicitly limited to limited circumstances not present in this record. Accordingly, a *de novo* standard applies to issues other than the Committee's factual determinations.

App. Vol. III at 857-859.

For the reasons explained by the District Court, this Court should apply the *de novo* standard of review to the Plan Administrator's denial of Plaintiff-Appellee's separation benefits.

### III.    <u>Plaintiff Resigned for Good Reason and Is Entitled to Separation Benefits</u>

To obtain benefits under the Plan, Plaintiff was only required to show that his duties and responsibilities were materially and adversely diminished in comparison to the duties and responsibilities he enjoyed immediately prior to the Change of Control.  App. Vol. I at 62.  Because the parties do not dispute that a Change of Control occurred or what Plaintiff's responsibilities and duties were prior to and after the Change of Control, the only issue is whether Plaintiff resigned for "Good Reason" under the Article II(s) of the Plan.  Based on the same full record before this Court now, and based on sound reasoning and applicable law, the District Court found that Plaintiff resigned for Good Reason and was therefore entitled to separation benefits.  App. Vol. III at 849-869.

The Court should affirm the District Court's Order and Judgment and similarly hold that Plaintiff is entitled to separation benefits under the Plan.

### A.    Plaintiff's Duties and Responsibilities Were Materially and Adversely Diminished

Applying the Plan language, the District Court found that Plaintiff's duties and responsibilities were materially and adversely diminished as compared to the period prior to the Change of Control.  App. Vol. III at 860.  The District Court held:

> While Mr. Hoff retained his Project Manager title and responsibility for the projects assigned to him at least part time, his duties and responsibilities for Oxy were far less than the responsibility and duties that he had previously enjoyed.  Mr. Hoff's assignment to answer engineering questions and assist with calculations has no apparent analogue in his role prior to the Change of Control, where he worked solely as a Project Manager with responsibility for Anadarko's largest project, including extensive supervisory responsibilities.  This support role does not hold any comparable responsibilities or duties to Mr. Hoff's project management role that comprised the entirety of this role prior to the Change of Control.  The change from a full-time management role to working a significant portion of time supporting another unit in a comparatively limited capacity was material in substantially changing Mr. Hoff's job and adverse in substantially diminishing his responsibilities. Those duties and responsibilities assigned to Mr. Hoff in project management, moreover, were orders of magnitude reduced from those he enjoyed prior to the Change of Control.  The diminution in his product management duties and responsibilities is apparent from his having so much spare time that he was assigned the support role.

App. Vol. III at 860-861.   This Court should adopt the District Court's sound analysis and reasoning as its own.

Indeed, the diminishment to Plaintiff's duties and responsibilities is unquestionably material and adverse.  See Bowles v. Quantum Chem. Co., 266 F.3d 622, 634 (7th Cir. 2001) (plaintiff entitled to severance under ERISA plan's voluntary separation clause because his budget was reduced and his supervisory duties eliminated); McClure v. Vice President, Human Res., Union Carbide Corp., CIV.A. H030054, 2005 WL 1214645, at *18 (S.D. Tex. May 20, 2005) (finding that when the employer took away the employee's budget, staff, and membership on the plant management team, it eliminated *material* components of his authority) (emphasis supplied); Dabertin v. HCR Manor Care, Inc., 373 F.3d 822, 829 (7th Cir. 2004) (reduction of, among other things, executive's budget, management, and hiring and firing authority, constituted "reduction in the scope of a Participant's authority, position, title, functions, duties or responsibilities" so as to trigger severance benefits under ERISA plan, despite "addition" to position responsibility for daily visits to sites managed).

### B.  Plaintiff's Demotion to a Part-Time Project Manager Role Show His Duties Were Diminished

Defendants argue Plaintiff did not suffer a diminishment in duties and responsibilities because he retained his Project Manager role and any reduction in his responsibilities was allegedly temporary.  App. Vol. I at 92; App. Vol. III at 744-747.  Defendants also argue that Project Mangers must manage the projects assigned to them, regardless of size, and there is no guarantee or expectation that

all projects will be of the same size.  Id.  In denying Plaintiff's administrative

appeal, the Committee noted "there were no other larger projects available to be

assigned to Mr. Hoff (other than in West Texas and Mr. Hoff expressed that he did

not want to travel)."  App. Vol. I at 90.

The District Court was not, and neither should this Court be, persuaded by

Defendants' arguments.  The District Court aptly found three fatal flaws in

Defendants' reasoning.  The District Court found these flaws to be grounds for

reversal of the Committee's denial under its *de novo* review ***and*** grounds for

reversal under the arbitrary and capricious standard.  App. Vol. III at 862-865.  As

the District Court explained:

> First, as discussed above, the replacement of a significant portion of
> Mr. Hoff's project management work with a role supporting another
> team was a material adverse change on its own. The Committee did
> not analyze this change in Mr. Hoff's job duties, instead reasoning
> that the change was temporary based on events that occurred after he
> resigned.  (R. 32-36, 93-96 [/App. Vol. I at 88-92, 149-152].)
> Defendants make no argument here that such a change was not a
> diminishment of responsibility.  (Doc. 31 at 16-17 [/App. Vol. III at
> 739-743].)  Indeed, Defendants describe the role as merely "helping
> the Mechanical Integrity ('MI') team with questions." (Id. at 13 [/Id.
> at 735-736].) That is a lesser role than project management of major
> projects that must be considered.  *Caldwell* [*v. Life Ins. Co. of N.
> Am.*], 287 F.3d [1276][,] 1282 [(10th Cir. 2002)] (explaining that a
> well-reasoned benefits decision must consider all essential job duties).
>
> Second, the Committee's argument relies too heavily on Mr. Hoff's
> job description, rather than his actual duties and responsibilities,
> contrary to the Plan language and the Committee's Examples. While it
> is undoubtedly true that Project Managers are responsible for
> performing the duties assigned to them regardless of the size of the

project, this is more a truism of employment than something unique to
project management. Street sweepers sweep streets regardless of
length. Judges manage the cases assigned to them regardless of
complexity. The Plan refers specifically to "duties and
responsibilities" and asks whether they were materially "diminished."
Thus, the inquiry must be into whether Mr. Hoff had materially less
duties and responsibilities than before the Change of Control. He did.
Other courts have found on similar facts and plan language that the
material diminishment in responsibilities and duties occurred despite
retention of job title and some responsibilities consistent with that
title. *Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 634 (7th Cir.
2001) (affirming a grant of benefits where "changes had a meaningful
impact" on duties despite job title remaining consistent); *Dabertin v.
HCR Manor Care, Inc.*, 373 F.3d 822, 829 (7th Cir. 2004) (finding a
reduction in responsibilities where the employee "had the same list of
duties before and after the merger; she just had fewer facilities in
which to perform them").

Indeed, the Committee appears to have recognized the proper inquiry
in the Examples it propounded regarding what constituted a Good
Reason. The Examples state that it would be a material diminishment
if an "employee went from managing ten employees to one employee
after the Change of Control." (R. 86 [/App. Vol. I at 142].) Mr. Hoff's
reduction in supervisory responsibilities was a more than ten to one
reduction (greater than 300 to less than 25). The Committee's finding
that Mr. Hoff's reduction in management responsibilities was not
material runs contrary to its interpretation of the plan in the Examples.
Such inconsistent interpretation and application is an abuse of
discretion that would warrant reversal even under that standard.
*Allison v. Bank One-Denver*, 289 F.3d 1223, 1236 (10th Cir. 2002), *as
amended on denial of reh'g* (June 19, 2002) ("We have repeatedly
rejected efforts to stray from the express terms of a plan, regardless
of whom those express terms may benefit."); *Lickteig v. Business Men's
Assurance Co.*, 61 F.3d 579, 585 (8th Cir. 1995).

Finally, the Committee's analysis is inconsistent with the Plan more
broadly. The Plan protects employees not only from having their role
reduced, but it also protects them from having to relocate. In addition
to a reduced role constituting a "Good Reason," it is also a Good
Reason when an employee is "required to be based at a location more

23

than 25 miles from the primary location where the Participant was
based and performed services immediately prior to the Change of
Control" or is required to travel frequently. (R. 6 [/App. Vol. I at 62].)
The Committee found that there were large projects available in West
Texas but rejected the relevance of these projects based on Mr. Hoff's
preference not to travel or relocate. (R. 34 [/App. Vol. I at 90].)
This reasoning is contrary to the Plan's unambiguous language
because it makes a protected decision (not to relocate or travel) a basis
for denying that a Good Reason exists (the reduction in
responsibilities).

Even if the Court were applying an arbitrary and capricious standard,
it would reject Defendant's arguments. The Committee's failure to
consider Mr. Hoff's support assignment, reliance on his Project
Manager job title, and contradictory interpretation of the Plan would
all warrant reversal. *Swaback v. Am. Info. Techs. Corp.*, 103 F.3d
535, 540 (7th Cir. 1996) ("[I]f fiduciaries or administrators of an
ERISA plan controvert the plain meaning of a plan, their actions are
arbitrary and capricious."); *Gosselink v. Am. Tel. & Tel., Inc.*, 272
F.3d 722, 726 (5th Cir. 2001) (holding that, in determining whether a
misinterpretation of a plan was an abuse of discretion, "a court must
consider: (1) whether the administrator has given the plan a uniform
construction, (2) whether the interpretation is consistent with a fair
reading of the plan, and (3) any unanticipated costs resulting from
different interpretations of the plan.").

App. Vol. III at 862-865.   As the District Court found, this Court should

similarly find that Plaintiff's duties and responsibilities were materially and

adversely diminished as compared to the period prior to the Change of

Control, and reverse the Committee's denial of Plaintiff's benefits.

### C.    The Plan Does Not Exclude Temporary Diminishments

The Plan Administrator denied Plaintiff's claim for benefits and his appeal

by discounting any diminishment in Plaintiff's duties and responsibilities as

"temporary" and therefore unable to constitute Good Reason under the Plan.  App. Vol. I at 91, 151.  As argued by Plaintiff at every stage, and confirmed by the District Court, "[t]his argument has no basis in the Plan language and is, instead, contrary to the Plan."  App. Vol. III at 865.

Defendants base their blanket rejection of "temporary" diminishments in duties and responsibilities as Good Reason in the Examples, which state, to be considered a Good Reason, a "change to duties must be permanent."  App. Vol. I at 141.  The Examples interpret the Plan such that "short-term reduction in duties due to lack of work, transition, reorganization, or similar matters does not qualify."  App. Vol. I at 141.  The contrasting examples provided are that "work slows down while management reviews work processes" during the integration of the companies, which is temporary, compared to a circumstance where a "supervisor states that one or more job duties held by the employee has been taken away," which is a "permanent change." App. Vol. I at 141.

In denying Plaintiff's benefits, the Committee reasoned on July 9, 2021, more than a year after Plaintiff's resignation and with the benefit of hindsight:

> The smaller project size was due to the economic crisis associated with the COVID-19 pandemic and its effect on the oil industry. Mr. Hoff terminated employment at the beginning of the COVID-19 crisis and during a time that the oil industry was facing dire economic hardships. This change was temporary and project work has been increasing as the economy has recovered.
> . . .

> Mr. Allin told the Committee that he asked Mr. Hoff to assist with the
> MI Team due to the slowdown in projects associated with the
> COVID-19 pandemic. Mr. Allin told the Committee that working on
> the MI Team was not a permanent change but instead a temporary
> assignment to provide assistance while Mr. Hoff had availability. The
> Committee previously determined in September 2019 that temporary
> changes do not constitute Good Reason events under the [Plan]. *See*
> [Examples].

App. Vol. I at 91.  Notably, the Plan does not include any *force majeure* clause or

similar term.  App. Vol. I at 57-86.  This alone undermines the Committee's

rationale for denial.

Importantly, nowhere in the Examples, nor in the entire record before the

Court, does the Committee explain how the Examples are consistent with the Plan

language or allege they fill in some implied but omitted term of the Plan.  App.

Vol. I at 141-144.  Rather, the Examples state they are "intended to constitute

general information" subject to the terms of the Plan, which controls.  App. Vol. I

at 141 ("If there is a difference between the information in this communication and

the [Plan], the [Plan] will control.").

Additionally, the Examples were published on September 10, 2019, one

month after the August 8, 2019, Change in Control.  App. Vol. I at 141-144.  Thus,

to the extent the Committee attempted to amend the Plan to add terms, it was not

permitted to do so after the Change in Control,[2] and therefore, surreptitiously attempted to use the Examples to contravene the requirements of the Plan to add *post hoc* impediments to Participant's benefits.  App. Vol. I at 71.  This conduct is expressly prohibited by the Plan.  Id.

Defendants nevertheless argue the Examples are an "interpretation" of the Plan; however, Defendants do not identify any ambiguity or implication in the Plan language that the Committee is granted authority to interpret.  Appellants' Opening Brief on the Merits ("Opening Brief") at pp. 41-42.  Additionally, no formal amendment to add the requirement of a "permanent" change of duties was ever adopted.  See Allison, 289 F.3d at 1236 ("This circuit has recognized that the requirement of formal amendments reflects ERISA's overall goal of protecting 'the interests of participants in employee benefit plans and their beneficiaries.'").  As such, the Plan language controls.  McGee v. Equicor- Equitable HCA Corp., 953 F.2d 1192, 1201 (10th Cir. 1992) (finding plan language controlled even in the face of conflicting interpretation that gave precedence to plan language).

The Plan, as amended, unambiguously limits the Committee's discretion to interpret the plan to a few circumscribed categories, none of which are present

---

[2] Article VII, § 7.1 of the Plan provides in pertinent part: "If a Change of Control occurs, the Plan shall no longer be subject to amendment, change, substitution, deletion, revocation or termination in any respect which adversely affects the rights of Participants."  App. Vol. I at 71.

here.  App. Vol. I at 79.  The Plan explicitly requires the Committee to use the "intended meanings" of the Plan's terms.  App. Vol. I at 79.  Such intention-based interpretation is consistent with basic principles of contract interpretation.

Pirkheim v. First Unum Life Ins., 229 F.3d 1008, 1010 (10th Cir. 2000) ("We give the words their common and ordinary meaning, as a reasonable person in the position of the plan participant (not the actual participant) would have understood them").  There is nothing in the Plan that limits a Good Reason to a permanent change to duties and responsibilities or implies that a temporary change to duties and responsibilities cannot be a Good Reason.  Rather, the Plan terms belie such an arbitrary and capricious interpretation.  App. Vol. I at 64.

The Plan sets short timelines for an employee to terminate their employment after any change, to be eligible for severance benefits.  App. Vol. I at 64.  Specifically, the Plan requires the "Participant terminate[] his or her Employment within ninety (90) days of such occurrence" for the change to be considered a Good Reason which could entitle the employee to severance benefits.  Id.  Defendants do not identify language in the Plan that provides for an extension of this period or otherwise allows for the possibility that temporary changes in work duties and responsibilities would not constitute a Good Reason.  App. Vol. I at 57-86.  As such, any employee who believes they have Good Reason to resign must resign within 90-days according to the Plan language or else risk losing separation

benefits.  App. Vol. I at 64.  Employees cannot be required to rely on an *ad hoc*

determination that an assignment is temporary before asserting their rights under

the Plan.

Tellingly, the Plan includes an explicit (and very narrow) provision

specifying one particular temporary occurrence that does not constitute a Good

Reason.  App. Vol. I at 62.  With respect to an employee being required to travel,

the Plan explicitly "excludes assignments or positions that might require temporary

travel for a specified, short duration of time . . . ."  App. Vol. I at 62.

Based on the foregoing, the District Court found:

> . . . No corresponding term exists in relation to diminishment in an
> employee's duties and responsibilities or any other Good Reason.
> Thus, it is apparent that the Plan excluded specific temporary
> circumstances where intended, and did not generally exempt
> temporary changes from constituting Good Reason.
>
> . . . [E]ven if the Court were applying an arbitrary and capricious
> standard, it would reject Defendant's arguments. The Committee
> points to nothing in the Plan that could constitute a reasonable basis to
> exclude all temporary circumstances from constituting a Good
> Reason.  *Egert v. Connecticut Gen. Life Ins. Co.*, 900 F.2d 1032,
> 1037-38 (7th Cir. 1990) (holding that guidelines contradicting a plan's
> requirements were arbitrary and capricious).

App. Vol. III at 868.  This Court should similarly find that the Committee's blanket

rejection of an allegedly "temporary" diminishment in Plaintiff's duties and

responsibilities as Good Reason, where the temporary nature of the diminishment

was only confirmed 13-months later (App. Vol. I at 91), was clearly erroneous,

contrary to the unambiguous terms of the Plan, and arbitrary and capricious.

## IV.   Denial of Plaintiff's Claim For Separation Benefits was Arbitrary and Capricious

Under the arbitrary and capricious standard the Court must uphold the

Committee's decision "so long as it was made on a reasoned basis and supported

by substantial evidence." Van Steen v. Life Ins. Co. of N. Am., 878 F.3d 994, 997

(10th Cir. 2018). "Substantial evidence is such evidence that a reasonable mind

might accept as adequate to support the conclusion reached by the decisionmaker."

Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1282 (10th Cir. 2002).

In determining whether the evidence in support of the administrator's

decision is substantial, the Court must take into account record evidence that

detracts from its weight. Id. "Indicia of arbitrary and capricious decisions include

lack of substantial evidence, mistake of law, bad faith, and conflict of interest by

the fiduciary." Id.  The Court also gives less deference if a plan administrator fails

to examine relevant evidence. Id.; see also Mason v. Reliance Standard Life Ins.

Co., No. 14-CV-01415- MSK-NYW, 2015 WL 5719648, at *7 (D. Colo. Sept. 30,

2015).

At the time of his termination for Good Reason on June 4, 2020, Plaintiff's

duties and responsibilities as Project Manager for the Plants and Major Projects

Division had materially and adversely diminished from managing a $450 Million

project, supervising over 300 workers and contractors, to running a single

$600,000 project and answering engineering questions for service evaluations.

App. Vol. I at 125-127.  At the time of his termination for Good Reason, Plaintiff

was responsible for budgeted projects equaling less than 0.14% of what he was

responsible for just prior to the Change in Control.  Id.  According to Mr. Allin,

prior to the Change in Control, Mr. Hoff's management responsibilities were over

a team of approximately 300 construction contractors, 20 engineers, and 10-15

construction inspectors. App. Vol. I at 127.  After March 9, 2020, Plaintiff's

management responsibilities were over teams of 10-20 construction contractors, 1-

2 engineers, and 1-2 construction inspectors. Id.  Furthermore, Plaintiff was added

to the MI team as technical support, in a non-project management role.  App. Vol. I

at 128-129.

    In order to deny the marked changes to Plaintiff's job duties and

responsibilities as of March 9, 2020, in comparison to what they were on August 7,

2019, Defendants intentionally misinterpreted the Plan's requirements, relying on

irrelevant factors and imagined criteria, which was arbitrary and capricious.

    **A.**   **The Plan Administrator is Entitled to Less Deference Due to
its Inherent Conflict of Interest**

    Where "the administrator or fiduciary having discretion is operating under a

conflict of interest, that conflict must be weighed as a factor in determining

whether there is an abuse of discretion." Metro. Life Ins. Co. v. Glenn, 554 U.S.

105, 112 (2008) (quoting <u>Firestone Tire & Rubber Co.</u>, 489 U.S. at 115)).  A plan administrator's dual role of both evaluating and paying benefits claims creates the kind of conflict of interest referred to in <u>Firestone</u>.  <u>Metro. Life Ins. Co.</u>, 554 U.S. at 112.  "The Tenth Circuit has adopted a sliding scale, decreasing the level of deference in proportion to the severity of the conflict."  <u>Pitman v. Blue Cross & Blue Shield of Oklahoma</u>, 217 F.3d 1291, 1295 (10th Cir. 2000) (citing <u>Jones v. Kodak Med. Assistance Plan</u>, 169 F.3d 1287, 1291 (10th Cir. 1999)). "The importance of a conflict of interest 'is proportionate to the likelihood that the conflict affected the benefits decision.'"  <u>Van Steen</u>, 878 F.3d at 997 (quoting <u>Graham v. Hartford Life & Accident Ins. Co.</u>, 589 F.3d 1345, 1358 (10th Cir. 2009)).

Here, the Committee was made up exclusively of long-term Oxy executives (App. Vol. III at 776), who held the following titles and tenures when Plaintiff's appeal was denied:

- Angela Knight, Director HR Systems and Benefits Administration, 18 years;

- Michele Oubre, Vice President HR Strategy & Services, 28 years;

- Jim Tally, Vice President Compensation & Benefits, 25 years;

- Mark Grommesh, VP Business Development & Joint Ventures, U.S. Onshore Resources and Carbon Management, 23 years;

- Melissa Jenkins, Manager Executive Compensation & Equity, 9 years; and

- Madelaine Pfahler, Director Benefits and Well-Being, 15 years.

App. Vol. III at 692-719.

Defendants argue that the Committee members were not compensated for their services so there is no weighable conflict of interest. Opening Brief at pp, 27-29. However, every Committee member was a long-term employee of Oxy, and the benefits payable under the Plan are paid "from the general assets of [Oxy]." App. Vol. I at 72.

As the U.S. Supreme Court recognized, every dollar saved by employers is a dollar earned by employers. See Metro. Life Ins. Co., 554 U.S. at 112 ("[W]here it is the employer that both funds the plan and evaluates the claims . . . [e]very dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket."); accord Yochum v. Barnett Banks, Inc. Severance Pay Plan, 234 F.3d 541, 544 (11th Cir. 2000) ("Where the funding for severance plans comes directly from the coffers of a company, rather than through a trust, there is a conflict of interest."). This direct conflict cannot be ignored.

Moreover, corporate officers are incentivized "to maintain an economically healthy and successful company in order to ensure the viability and competitiveness of the company for the sake of their own job stability." Pitman,

33

217 F.3d at 1296 (finding a conflict of interest); see also Yochum, 234 F.3d at 544 (finding a conflict of interest where the members of the committee making the benefits decision are employees of the company that would have to pay the benefits).

The denial of Plaintiff's claim saved Oxy more than $700,000 (at the time of denial). The Committee members' denial further provided their long-term employer stability during a period they described as an "economic crisis" and "a time that the oil industry was facing dire economic hardships." App. Vol. I at 91. The clear incentive and conflict in denying Plaintiff's benefits is both weighable and heavy.

### B.  The Committee Abused Its Discretion When It Failed to Apply the Plan as Written

Pursuant to Article II(s)(i) of the Plan, a Good Reason event occurs when "[a] Participant's duties and responsibilities as an Employee are materially and adversely diminished in comparison to the duties and responsibilities enjoyed by the Participant immediately prior to the Change of Control." App. Vol. I at 62. This language does not require interpretation. The Plan language is clear, and unambiguous. Contrary to the justifications used in Defendants' denial letters (App. Vol. I at 87-102, 148-158), the Plan did not require Plaintiff to show his diminished duties and responsibilities were inconsistent with his job title,

inconsistent with his position, permanent, not resulting from an economic crisis or pandemic, nor caused by any particular occurrence.  App. Vol. I at 62.

Defendants' imposition of these requirements on Plaintiff's claim for benefits was a violation of ERISA.  "Every employee benefit plan is to be established and maintained pursuant to a written instrument."  29 U.S.C. § 1102(a)(1).  When "fiduciaries or administrators of an ERISA plan controvert the plain meaning of a plan, their actions are arbitrary and capricious."  Swaback, 103 F.3d at 540.  Indeed, where the administrator imposes a standard not required by the plan's provisions or interprets the plan in a manner inconsistent with its plain words, its actions are arbitrary and capricious.  See Pepe v. Newspaper & Mail Deliveries'-Publishers' Pension Fund, 559 F.3d 140, 147 (2d Cir. 2009); see also Allison, 289 F.3d at 1236 ("We have repeatedly rejected efforts to stray from the express terms of a plan, regardless of whom those express terms may benefit.").

### C.    The Plan Administrator's Reliance on the Absence of Promises or Guarantees to Plaintiff to Deny His Claim Was an Abuse of Discretion

Defendants denied Plaintiff's claim for benefits based in part on their belief that he was not "guaranteed" or "promised" a certain number of direct reports or supervision over a particular number of people, nor was he "guaranteed" or "promised" a certain project size or budget size.  App. Vol. I at 89-90, 149-151.

Plaintiff, however, never claimed he was given guarantees or promises. That is because the Plan does not require an employee to have first received a guarantee or promise of certain duties and responsibilities before determining whether those duties and responsibilities were materially and adversely diminished.  Vol. I at 62.  Defendants' contrary interpretation is erroneous, arbitrary, and capricious.  This hurdle, concocted only to deny Plaintiff's specific claim does not arise from any of the Plan's actual language.

### D.    Reliance on Plaintiff's Job Title is Arbitrary and Capricious

A change in job title is not required to constitute Good Reason.  App. Vol. I at 62.  Under the plain language of the Plan, it is of no relevance or legal consequence that Plaintiff remained a "Project Manager" when analyzing whether his duties and responsibilities were materially and adversely diminished. Defendants arbitrarily and capriciously used Plaintiff's lack of title change to deny Plaintiff's claim for benefits.  App. Vol. I at 88-93, 149-154.

When Plaintiff's assigned projects went from the largest projects in the Plants and Major Projects Division to projects that would not even qualify as projects assigned to the Major Projects Division just prior to the Change in Control, his duties and responsibilities were objectively, visibly, materially, and adversely diminished.  That he retained the title of "Project Manager" is inconsequential under the Plan.  App. Vol. I at 57-86.

36

Focusing on Plaintiff's title is contrary to the Plan's plain terms, and the Examples. App. Vol. I at 142. In the Examples, the Plan Administrator indicates a change in job title is not dispositive. Id. ("Example: After the Change of Control, an employee's job title is changed in what is perceived to be adverse but the employee has the same job duties. No material diminishment has occurred."). Yet, it is clear from reading the Committee's denial letters, the primary motivation in denying Plaintiff's claim was its conclusion that Plaintiff was a Project Manager before the Change in Control and a Project Manager after the Change in Control. App. Vol. I at 88-93, 149-154. This rationale is contrary to the Plan language.

Further, the Plan Administrator determined that because Plaintiff's new smaller projects could fall within the duties and responsibilities of a Project Manager (App. Vol. I at 93), that Plaintiff was assigned projects in the same way he was assigned projects prior to the Change in Control (App. Vol. I at 90), and that Plaintiff was not assigned projects differently than other Project managers (App. Vol. I at 93), then Plaintiff could not have suffered a material and adverse diminishment of duties and responsibilities. This is incorrect. The Plan Administrator misconstrued the Plan's plain language. The Plan does not address whether Plaintiff's duties and responsibilities are consistent with his job title. The Plan only speaks to whether Plaintiff's duties and responsibilities just prior to the Change in Control were materially and adversely diminished as of the date

37

Plaintiff resigned.  Unequivocally, Plaintiff's duties and responsibilities were diminished.

The Committee abused its discretion by blindly adhering to Plaintiff's job title, rather than his actual duties and functions.  This abuse of discretion is further highlighted by the fact that Plaintiff sought review of his job description with three separate discovery requests.  Defendants objected to and failed to respond to all three requests.  App. Vol. III at 778, 780.  Shockingly, Plaintiff's job description was never reviewed or considered by the Committee.  App. Vol. I at 87, 148.  See Caldwell, 287 F.3d at 1282 ("The court . ("The court . . . gives less deference if a plan administrator fails to examine relevant evidence."); Murphy v. Deloitte & Touche Grp. Ins. Plan, 619 F.3d 1151, 1163–64 (10th Cir. 2010) ("district court may allocate significant weight to a conflict of interest where the record reveals a lack of thoroughness.").

### E.    The Plan Administrator's Focus on Causation is Contrary to the Plan's Plain Language

The Plan Administrator attempts to justify its denial by stating, "The smaller project size was due to the economic crisis associated with the COVID-19 pandemic and its effect on the oil industry."  App. Vol. I at 91. The Plan Administrator goes on to declare: "These changes in project size do not have any relation to the COC and were not determined by Oxy or WES.  The changes were part of normal economic fluctuations."  Id.

Critically, under the plain and unambiguous language of the Plan, what (or who) caused the material and adverse diminishment of Plaintiff's duties and responsibilities is of absolutely no relevance. App. Vol. I at 62. As written, the Plan states no requirement that the diminishment of duties and responsibilities must have been caused by the Change in Control or must have been caused by Oxy or WES. Id. As stated, the Plan contains no *force majeure* clause. App. Vol. I at 57-86. The Plan Administrator cannot insert a causation requirement where none exists. There is no ambiguity.

Under the Plan's terms (App. Vol. I at 62), the assertion that neither the Change in Control, nor Oxy, nor WES, were the cause of the diminishment in Plaintiff's duties and responsibilities is inapposite. But see App. Vol. I at 92 (Committee's appeal denial letter: "Thus, even if the changes in project activity were permanent, they were unrelated to any action that was taken by WES as the cause of the slowdown was an international economic development caused by the pandemic and unrelated to Oxy, WES or the COC."). Nowhere in the 30 pages of the Plan, including the three amendments, does the Plan require the diminishment be caused by the Change in Control (or caused by any particular circumstance for that matter). App. Vol. I at 57-86. The cause of the diminishment is thus entirely irrelevant and the Plan Administrator's continued reliance on causation is an abuse

of discretion, confirming the Plan Administrator's denial was arbitrary and capricious.

The Committee's appeal denial letter reveals a telling admission, stating "the projects in 2020 were smaller than projects that were in place before the COC." App. Vol. I at 91.  That admission unequivocally establishes that Plaintiff's duties and responsibilities as Project Manager of Plants and Major Projects prior to the Change in Control were materially and adversely diminished because the projects in 2020 were smaller.  Id.  Additionally, when the Plan Administrator admits Plaintiff was assigned smaller projects and he was asked to provide support to the MI team answering questions for service valuations "due to the slowdown in projects associated with the COVID-19 pandemic" (Id.), the Plan Administrator concedes Plaintiff's entitlement to benefits under the Plan's plain language.  App. Vol. I at 62.  This alone is dispositive.

Inserting a causation requirement not contained in the Plan, and then relying on that non-existent requirement to deny Plaintiff's benefits must be rejected by this Court.

      **F.**      **The Committee's _Post Hoc_ Contention that Plaintiff's Diminishment of Duties and Responsibilities Was Temporary was an Abuse of Discretion**

On July 9, 2021, the Committee wrote about Plaintiff's smaller project assignments and his role as support for the MI team in March-June 2020: "This

change was temporary and project work has been increasing as the economy has recovered." App. Vol. I at 91.

As of the date Plaintiff terminated his employment for Good Reason, however, Plaintiff had not been assigned any other projects other than the Ramsey Slug Catcher and the Wattenberg Engine Overhaul (which had been deferred to 2021 and was not guaranteed to be reassigned to Plaintiff). App. Vol. I at 70.

Despite not being a factor relevant to a Good Reason event as defined by the Plan (App. Vol. I at 62), Plaintiff's diminishment in job duties and responsibilities was not temporary. When Plaintiff resigned, there were no upcoming or foreseeable major projects forthcoming and, in fact, he had been given an entirely new role as support engineer for the MI team, which had no project management duties or responsibilities at all. App. Vol. I at 128-129.

The Committee points to the Examples where it stated that temporary changes do not constitute Good Reason events under the Plan. App. Vol. I at 141. The Committee also claims that during its interview of Mr. Allin *in June 2021* (App. Vol. II at 437), and in support its denial of Plaintiff's claim, that "Mr. Allin told the Committee that he asked Mr. Hoff to assist with the MI Team due to the slowdown in projects associated with the COVID-19 pandemic." App. Vol. I at 91. "Mr. Allin told the Committee that working on the MI Team was not a permanent change but instead a temporary assignment to provide assistance while

41

Mr. Hoff had availability." App. Vol. I at 91. None of these facts was known, nor claimed to have been known, as of March 9, 2020 (date of Good Reason event) or June 4, 2020 (last working date Plaintiff could resign for Good Reason). App. Vol. I at 64.

Importantly, Mr. Allin does not say he told Plaintiff his work on the MI Team would be temporary. Plaintiff was never told these changes were temporary. When Plaintiff made his Good Reason inquiry on March 30, 2020, there were no upcoming or foreseeable projects forthcoming, and as he understood: "This is not a temporary change as the capital program does not include funding of any comparable facility programs or projects at a minimum through 2020 [the next nine months] falling under my oversight." App. Vol. III at 651.

The Committee also notes in its denial letter "[t]hus, even if the changes in project activity were permanent, they were unrelated to any action that was taken by WES as the cause of the slowdown was an international economic development caused by the pandemic and unrelated to Oxy, WES or the COC." App. Vol. I at 92. As mentioned above, the cause of the change is of no legal consequence. The Committee's statement operates as an admission that Oxy did not communicate to Plaintiff, nor did it know, that the changes were (allegedly) temporary when the changes were made.

42

More importantly, there was no timeframe or expiration date communicated to Plaintiff regarding his reassignment to the MI team.  App. Vol. I at 128-129.  A determination regarding whether there is a material and adverse diminishment of duties and responsibilities must be made based on facts available at the time Plaintiff resigned for Good Reason, and not years later with the benefit of hindsight in order to argue that the changes were "temporary," as the Plan Administrator does here.[3]

The Plan Administrator's Examples (App. Vol. I at 141-144), inserting requirements outside the four corners of the Plan, asserts for the first time that changes to duties must be permanent cannot open the door for the Plan Administrator to claim years after the fact, that challenged changes were just temporary, simply to avoid liability.  This non-temporary requirement, if applied despite not being included in the Plan document, is only reasonably applied when the temporary nature of the change is known during the Participant's employment and at the time of the Good Reason event.  A contrary requirement would be absurd especially given the 90-day window to resign.  Indeed, in order to defeat any beneficiary's claim for benefits, Defendants could claim that if the employee would have lasted one more day, they would have been promoted to CEO.  This

---

[3] The Committee denied Plaintiff's appeal on July 9, 2021, more than a year after Plaintiff resigned for Good Reason on June 4, 2020.  App. Vol. I at 87-99.

Court should not cosign such an absurd reading of the Plan any more than the Defendants should be permitted to offer it.

As discussed, Defendants failed to act in accordance with the documents and instruments governing the Plan by inserting superfluous terms into the definitions and Plan documents which are non-existent, not supported by ambiguity in the Plan's language, and which introduce requirements to obtaining benefits that were not contemplated by the Plan.

The decision made by the Plan Administrator was arbitrary and capricious and cannot not be upheld. Defendant's denial of Plaintiff's claim under the Plan should be reversed and the determination of the District Court should be affirmed.

## G.    The Committee's Efforts to Get Mr. Allin to Contradict and Disavow His Sworn Statements is an Abuse of Discretion

Defendants next claim the Committee considered Plaintiff's July 27, 2020, claim for benefits on November 5, 2020, and that during that meeting, the Committee "interviewed" Jay Allin, about the declaration he signed (App. Vol. I at 164-166) which was attached to Plaintiff's claim for benefits. App. Vol. I at 160-163. The Committee's counsel summarized Mr. Allin's purported statements to the Committee in a summary (App. Vol. II at 556), despite not being identified as present at the meeting. App. Vol. II at 553; App. Vol. III at 781.

Significantly, many of the statements summarized by the Committee's counsel as being made to the Committee by Mr. Allin contradict Mr. Allin's sworn

declaration.  App. Vol. I at 164-166; App. Vol. II at 556.  There is nothing in the Appellants' Appendix (App. Vol. I at 1- App. Vol. III at 874), other than Mr. Allin's declaration which is in Mr. Allin's own words or signed by Mr. Allin.  Id. Indeed, the Committee has no recording, no notes, or any written statements by Mr. Allin, or any other verifiable statement from Mr. Allin's contradicting his sworn declaration signed under penalty of perjury.

Despite having no verified statements, nor transcripts or recordings of actual statements from Mr. Allin, the Committee used summaries of interviews with Mr. Allin prepared by its counsel (who may not have even been present during the interviews) (App. Vol. II at 554, 556), to contradict his sworn declaration, and used those contradictory statements to deny Plaintiff's claim.  App. Vol. I at 164-166; App. Vol. II at 554, 556.

Reliance by the Committee on unsworn statements that contradict sworn statements made under oath and under penalty of perjury to deny Plaintiff's claim for benefits was an abuse of discretion and was arbitrary and capricious.

Moreover, it is highly suspicious, especially in light of the Committee's weighable conflict, that the Committee's counsel's summary of Mr. Allin's verbal interview with the Committee on July 7, 2021 claims that Mr. Allin "reiterated that in the role of Project Manager, there is no entitlement or expectation of project size" and "Project Managers manage the projects that are assigned to them" (App.

45

Vol. II at 554), when, in the Good Reason Subcommittee's denial letter thirteen months earlier, also written by the Committee's counsel (App. Vol. III at 782), the Subcommittee stated the nearly identical sentiment that: "[a]s a Project Manager, you are responsible for managing the scope, schedule and budget of a given project regardless of the size or monetary value." App. Vol. II at 303. Notably, no similar statement was included in Mr. Allin's declaration dated July 27, 2020, which Mr. Allin was given a full and fair opportunity to revise and did. App. Vol. I at 164.

> **H.** **The Committee's Discussion of Plaintiff's Preference Not to Travel Confirms Defendants were Intentionally Avoiding a Good Reason Event**

In denying Plaintiff's benefits, the Committee relied on Mr. Allin's statement that he asked Plaintiff if he would be willing to take on projects in West Texas, but Plaintiff declined because he did not want to travel. App. Vol. I at 89; App. Vol. II at 554, 556.

Consideration of this fact by the Committee to deny Plaintiff's claim confirms two things. First, it confirms Defendants were intentionally trying to avoid giving Plaintiff Good Reason because if Mr. Allin required Plaintiff to travel, that would have constituted Good Reason under the Plan (App. Vol. I at 62). Instead, Mr. Allin did not require Plaintiff to travel but gave him low-level projects and help desk assignments appropriate for a Project Manager with 1-2

years of experience rather than projects which required the 10+ years of experience Plaintiff possessed.  App. Vol. I at 165.

Second, it confirms that Mr. Allin knew the work available in Colorado and the surrounding areas was not appropriate for Plaintiff's level of experience and was not sufficient to keep him at the same level of duties and responsibilities he previously held.  There would otherwise be no reason to ask Plaintiff to travel to West Texas for work.  Mr. Allin's discussion with the Committee on multiple occasions (App. Vol. II at 554, 556) conclusively establishes Plaintiff suffered a material and adverse diminishment of duties and responsibilities when he decided not to travel to Texas for work.  The Committee's denial of Plaintiff's claim in the face of this clear evidence was arbitrary and capricious.

## V.    The Cases Cited by Defendants are Inapposite

Defendants cite nine cases in their Opening Brief for the proposition that courts have affirmed administrator decisions with similar fact patterns.  Opening Brief at pp. 35-38.  Three of the nine cases cited by Defendants are Defendants' counsel's own cases from the Southern District of Texas for two different oil and gas companies which have entirely different plan language and facts than those at issue here.  The nine cases cited in the Opening Brief are further distinguishable because not one of the cases cited by Defendants involves a reduction in duties and responsibilities of the size and nature Plaintiff suffered.

In <u>Boyd v.</u>In <u>Boyd v. ConAgra Foods, Inc.</u>, plaintiff sought benefits for being excluded from two meetings and a hiring decision for a subordinate.  <u>Boyd v. ConAgra Foods, Inc.</u>, 879 F.3d 314, 321 (8th Cir. 2018).  In <u>Liston v. Unum Corp. Officer Severance Plan</u>, plaintiff sought benefits for "job elimination" because her work obligations increased and she had less authority to make strategic and administrative decisions such as salary decisions for subordinates.  <u>Liston v. Unum Corp. Officer Severance Plan</u>, 330 F.3d 19, 21-24 (1st Cir. 2003).  The court there found that some of the plaintiff's duties made her job more demanding and the two duties she alleged were taken away were too abstract to conclude that the two *different* committees that denied her benefits acted arbitrarily.  <u>Id.</u> at 25.  The court also found that the plaintiff's urged reading of the plan language was "absurd" "untenable" and "makes no sense."  <u>Id.</u> at 23.

In <u>Boyd</u> and <u>Liston</u>, the plaintiffs sought benefits for slight exclusions or changes to their roles which were not objectively material nor adverse, unlike Plaintiff here, who suffered, *inter alia*, a budget size cut of 99.86% and reduction of more than 90% in project team size.  App. Vol. I at 126-127.

In <u>Evans v. Newfield Expl. Co.</u>, the court found the plaintiff's job responsibilities did not change, as reflected in the replacement job description, and further, the court found it relevant the plaintiff did not wait the full 30 days to resign to learn more about his new position.  <u>Evans v. Newfield Expl. Co.</u>, 2021

WL 2764858, at *7 (S.D. Tex. 2021).  In contrast, here, Plaintiff waited until the last possible day to resign under the Plan hoping his duties and responsibilities would be restored when in fact, during that waiting period, they were further diminished.  App. Vol. I at 70, 128-129; App. Vol. III at 651.

In <u>Clark v. Fifth Amended and Restated Newfield Exploration Co.</u>, the court affirmed the denial of benefits where plaintiff's title, reporting structure, and organizational unit had changed, but the nature and scope of her job duties were not reduced.  <u>Clark v. Fifth Amended and Restated Newfield Exploration Co.</u>, 2021 WL 5155699, at *8-9 (S.D. Tex. 2021).  Here, the circumstance for Plaintiff is the exact opposite of what happened in <u>Clark</u>.  Plaintiff's title, reporting structure and organizational unit remained the same, but the nature and scope of his job duties and responsibilities were reduced down to 0.14% of what they were previously. App. Vol. I at 126.

In <u>Kreuger v. Surewest Comm., Inc.</u>, the court found the changes to the plaintiff's duties and responsibilities were never made final because the scope of the new position was still being discussed when plaintiff resigned; any material reduction due to elimination of area of supervision was cured by the addition of a new area of supervision; and the anticipated reduction in plaintiff's compensation was never made final before plaintiff resigned.  <u>Kreuger v. Surewest Comm., Inc.</u>, 2014 WL 4635581, at *8-10 (E.D. Cal. 2014).  Here, unlike in <u>Kreuger</u>, Plaintiff's

duties and responsibilities remained materially and adversely diminished for the entire 90-day period that followed his initial Good Reason event on March 9, 2020, and 90 days later there was no change for the better, no increase, nor any pipeline (real or project-wise) in sight.  App. Vol. III at 651.

In Adair v. Abbott Severance Pay Plan for Emp. of Kos Pharm., the court found the Plan Administrator's denial of benefits was an abuse of discretion because it used an unsupported interpretation of a term to deny the plaintiff's benefits.  Adair v. Abbott Severance Pay Plan for Emp. of Kos Pharm., 781 F. Supp. 2d 238, 241-242 (D.N.J. 2011).  Plaintiff urges the same conclusion here.

In Clayton v. ConocoPhillips Co., plaintiff did not suffer a reduction in benefits because plaintiff's benefits remained unchanged and did not suffer a "substantial reduction" where there were only some differences but none of them adverse or material.  Clayton v. ConocoPhillips Co., 2010 WL 11578477 at *6 (S.D. Tex. 2010).  As explained, supra, changes to Plaintiff's duties and responsibilities were unquestionably material and adverse.   Plaintiff suffered a budget size cut of 99.86%, a reduction of more than 90% in project team size, and was relegated to providing engineering support to the MI team where he answered engineering questions for service evaluations and made other supporting calculations - a role with no management duties or responsibilities.  App. Vol. I at 126-129.

In <u>Hupp v. Metromail Corp. Special Severance Plan</u>, the court upheld the denial of benefits where plaintiff continued in his changed position for almost one and a half years after the change in control thus the court found that the changes to plaintiff's position were properly characterized as "voluntary" changes which were excepted from the definition of Good Reason under the plan.  <u>Hupp v. Metromail Corp. Special Severance Plan</u>, 133 F. Supp. 2d 681, 692 (N.D. Ill. 2001).  In contrast, Plaintiff here sought a determination that the diminishment in his duties and responsibilities on March 9, 2020 was material and adverse within a few weeks of the changes (on March 30, 2020) (App. Vol. II at 306-315), and ultimately resigned within the short time frame required under the Plan.  App. Vol. I at 64, 87.  Unlike in <u>Hupp</u>, the diminishment of Plaintiff's duties and responsibilities between March 2020 and the date he resigned 87 days later, cannot be characterized as voluntary.

Lastly, in <u>Gall v. Liberty Mut. Ins. Grp.</u>, plaintiff was denied benefits because her title change was in title only and was not placement in a position of lesser stature, and elimination of plaintiff's car allowance was specifically exempted by plan language regarding company-wide benefits reductions.  <u>Gall v. Liberty Mut. Ins. Grp.</u>, 2001 WL 290194 at *5-6 (N.D. Ill. 2001).  Here, unlike the plaintiff in <u>Gall</u>, Plaintiff did not suffer a title change, but was relegated to a

position of lesser stature by being assigned no major projects and being placed on the MI team to answer help desk questions.  App. Vol. I at 126-129.

None of the cases cited by Defendants involves a reduction in duties and responsibilities of the size and nature Plaintiff suffered, and none have plan language similar to the Plan language at issue here.  Accordingly, these cases are not instructive to the Court's determination of Plaintiff's claim.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully seeks an Order from this Court affirming the District Court's Order and Judgment in favor of Plaintiff-Appellee David B. Hoff, based on this Court's own *de novo* findings, or, if applicable, based upon a finding that Defendants' denial of Plaintiff's benefits was arbitrary and capricious.

Plaintiff-Appellee David B. Hoff, seeks an Order from this Court as follows:

(1)     Affirming the District Court's Final Judgment in favor of Plaintiff, David Hoff, and against Defendants, Amended and Restated Anadarko Petroleum Corp. Change of Control Severance Plan and Anadarko Petroleum Corporation Health and Welfare Benefits Administrative Committee;

(2)     Ordering Defendants to pay Plaintiff's Separation Benefits consistent with the Plan;

52

(3)     Awarding Plaintiff his pre-judgment interest on his Separation Benefits that accrued prior to the date of the District Court's Judgment at the rate set by Colo. Rev. Stat. § 5-12-102(2););

(4)     Awarding Plaintiff his post-judgment interest, accrued on the total amount of Plaintiff's Separation Benefits and pre-judgment interest at the legal rate pursuant to 28 U.S.C. §1961 from the date of the District Court's Judgment; and

(5)     Awarding Plaintiff all of his reasonable attorneys' fees and costs incurred in pursuing his Separation Benefits consistent with the Plan, including fees and costs incurred during the administrative proceedings, the District Court proceedings, and this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellee requests oral argument if it will materially assist the Court in its decision.

Respectfully submitted this 8th day of May, 2024.

By:     /s/ *Leah P. VanLandschoot*

Leah P. VanLandschoot
Colo. State Bar No. #35723
THE LITIGATION BOUTIQUE LLC
78 West 11th Avenue
Denver, Colorado 80204
(303) 355-1942
lvanlandschoot@thelitbot.com

***Attorney for Plaintiff-Appellee David B. Hoff***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel certifies that an electronic copy of Appellee's Answer Brief was electronically filed with the Clerk of the Tenth Circuit in compliance with Tenth Circuit Rule 25 on May 8, 2024.   The undersigned counsel further certifies that a PDF copy of Appellee's Answer Brief was contemporaneously served by the Court's electronic-filing system on counsel for Appellants in compliance with Federal Rule of Appellate Procedure 25 and Tenth Circuit Rule 25.3, on May 8, 2024.

/s/ *Leah P. VanLandschoot*
Leah P. VanLandschoot

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS</u>

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 12,985 words.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word in Times New Roman 14-point font.

/s/ *Leah P. VanLandschoot*

Leah P. VanLandschoot

## CERTIFICATE OF DIGITAL SUBMISSION

Pursuant to Fed. R. App. 25, 10th Cir. R. 25.3, and Section II.J of the

Court's CM/ECF User Manual, I hereby certify that:

1.      All required privacy redactions have been made in accordance

with Fed. R. App. P. 25(a) and 10th Cir. R. 25.5;

2.      Any hard copies of this brief required to be submitted shall be

exact copies of this electronically-filed version, which was submitted to the

Clerk of the United States Court of Appeals for the Tenth Circuit using the

CM/ECF system; and

3.      This brief has been scanned for viruses with the most recent

version of the commercial virus scanning program Microsoft Defender, and

no viruses were detected.

/s/ *Leah P. VanLandschoot*
Leah P. VanLandschoot